# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-01343-SCT

*SHANIKA HILL AND BRIAN THOMAS,*
*INDIVIDUALLY AND AS WRONGFUL DEATH*
*BENEFICIARIES OF THEIR DECEASED CHILD*

*v.*

*STEPHEN MILLS, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/10/2008 |
| TRIAL JUDGE: | HON. DAVID H. STRONG, JR. |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JENNIFER INGRAM WILKINSON |
| | JOHN F. HAWKINS |
| | CARROLL H. INGRAM |
| ATTORNEY FOR APPELLEE: | J. ROBERT RAMSAY |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 01/28/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT**:

¶1. The primary issue presented by the plaintiff in this medical-negligence case is whether the trial court properly applied Mississippi Rule of Evidence 702 (sometimes referred to as the **Daubert**[1] standard) to exclude the opinions offered by her expert, leading to dismissal of all of her claims. We are also asked to review the trial judge's denial of the plaintiff's motion to recuse.

---

[1]**Daubert v. Merrell Dow Pharmaceutical**s, 509 U.S. 579, 593-94, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). This Court adopted the **Daubert** (federal court) approach to expert testimony by amending Mississippi Rule of Evidence 702 in 2000 and 2003.

## BACKGROUND FACTS AND PROCEEDINGS

¶2. On May 8, 2002, Shanika Hill presented to King's Daughters Medical Center, complaining of lower abdominal pain and vaginal bleeding. Dr. Richard Rushing admitted her for overnight observation. Upon review of an ultrasound, Dr. Rushing determined Hill was fifteen weeks pregnant. After instructing Hill to remain on bed and pelvic rest and to follow up with the Health Department in a week, Dr. Rushing discharged her from King's Daughters. As instructed, Hill presented to the Health Department on May 16, 2002, where she again complained of spotting and vaginal bleeding.

¶3. On May 27, 2002, Hill returned to the King's Daughters Emergency Department, complaining of abdominal cramping, passing of large clots, and passing of one specimen that appeared to be products of conception. She was treated by Dr. Stephen Mills, who found Hill's cervix to be closed, with no active bleeding. Nurses were unable to determine the existence of fetal heart tones during auscultation.

¶4.     Dr. Mills informed Hill she had experienced a complete abortion.[2] He did not order an ultrasound, and discharged Hill from King's Daughters with instructions to return if there was any reoccurrence of abdominal cramping or vaginal bleeding.

¶5.     On June 8, 2002, Hill returned to King's Daughters with symptoms of severe abdominal pain and heavy vaginal bleeding. Prior to arriving at the emergency room, she had been vomiting blood and bleeding from her nose. Hill testified she had feared for her life. She informed the emergency department personnel that she had miscarried on May 27, but she was having heavy cramping in her legs and lower abdomen. While waiting for treatment, Hill delivered a nineteen-week fetus, weighing 205 grams. The attending nurse noted a fetal heartbeat, which stopped after five minutes. A second heartbeat was noted by a lab technician, but it stopped before the attending nurse could verify the heartbeat.

¶6.     Hill and Brian Thomas, the father of the baby, brought a civil action against Dr. Mills, King's Daughters, and every physician who treated Hill from May 8, 2002, through June 2, 2002. They voluntarily dismissed all defendants other than Dr. Mills.

**Expert Opinions.**

---

[2]According to a medical treatise, a portion of which was admitted into the record, a complete abortion occurs when there is "complete detachment [of the placenta from the uterus] and expulsion of the conceptus," after which "the internal cervical os closes." F. Cunningham, Kenneth Levero, Steven Bloom, John Hauth, Larry Gilstrap, Katherine Wenstrom, *Williams Obstetrics* 9, p. 246 (22nd ed. 2005). "*Abortion* is the termination of pregnancy, either spontaneously or intentionally, before the fetus develops sufficiently to survive. By convention, abortion is usually defined as pregnancy termination prior to 20 weeks' gestation or less than 500-g birthweight. . . . Abortion occurring without medical or mechanical means to empty the uterus is referred to as *spontaneous*. Another widely used term is *miscarriage*." *Williams Obstetrics*, at p. 232. In reference to the termination of Hill's pregnancy, the term "abortion" is used to refer to a *spontaneous abortion* or *miscarriage* throughout this opinion and does *not* refer to the more commonly used definition of the word "abortion"– an intentional termination of pregnancy through medical or mechanical means.

3

¶7. The plaintiffs engaged Dr. Paul G. Fuselier to examine the records and serve as their expert witness. In his deposition, Dr. Fuselier testified that Dr. Mills had breached the standard of care by failing to order an ultrasound on May 27. Specifically, Dr. Fuselier opined that, had Dr. Mills ordered the ultrasound, he would have discovered the pregnancy and, had the pregnancy been discovered,

> there [was] a great probability that with proper instruction, proper medication[,] proper surveillance that her pregnancy could have been extended. . . . Based on 25 years of obstetrical experience, residency training, et cetera, that given these circumstances, there is a great probability that the pregnancy could have been extended possibly to a point where there would be enough fetal maturity for the baby to survive.

¶8. When asked how old a fetus would have to be to survive outside the womb, Dr. Fuselier testified, "The closer you are to 32 weeks, the better off you are. That seems to be the cut off. But after 28 weeks the – if you're in a bell-shaped curve, those babies – a lot of those babies with the current modalities we have of treating survive." When asked whether Hill's pregnancy could have been extended an additional eight or nine weeks, Dr. Fuselier answered, "Or more."

¶9. Dr. Fuselier's deposition notice required him to produce "all published or unpublished articles or any other materials relied upon by [him] or otherwise supporting his opinions." In response to the notice, Dr. Fuselier produced no articles or other materials. When asked in deposition if he could provide any evidence-based scientific literature to support his opinion that bed rest was effective in preventing an early second-trimester miscarriage, Dr. Fuselier testified, "I don't have that information with me nor do I recall reading that." When asked if he was aware of any support within the scientific community for his opinion

4

concerning the value of tocolytics[3] in extending pregnancy, Dr. Fuselier testified, "I am not familiar with that literature at all." When asked if he had ever looked at the literature on subchorianic hematomas,[4] Dr. Fuselier responded "not recently." Near the end of his deposition, Dr. Fuselier was asked, "Do you contend that any such evidence-based literature exists to support your statements?" He responded, "I'm not aware today. I'm not sure that I couldn't find something."

¶10. After deposing Dr. Fuselier, Dr. Mills filed a motion to exclude Dr. Fuselier's opinions pursuant to Rule 702, using the ***Daubert*** standard. Additionally, Dr. Mills moved for summary judgment. In support of the motion to exclude Dr. Fuselier's testimony, Dr. Mills provided the expert opinions of Dr. John C. Morrison, who testified that Dr. Mills did not breach the standard of care by failing to perform an ultrasound. He reasoned that, even had the ultrasound revealed that Hill was still pregnant, there was nothing Dr. Mills could have done to save the pregnancy. With respect to Dr. Fuselier's testimony that Hill's pregnancy could have been extended, Dr. Morrison stated:

> Dr. Fuselier's "opinions" that bed rest, surveillance with both acute and maintenance tocolytic therapy, if necessary, could possibly have extended Ms. Hill's 17 3/7 week pregnancy for an additional 8 or 9 weeks or more following her May 27, 2002, visit to King's Daughters Medical Center Emergency Department, are totally unsupported in the scientific literature.

---

[3]The term "tocolytics" refers to drugs which "inhibit myometrial contractions. . . [and] can be administered either parenterally or orally." *Management of Preterm Labor*, 43 ACOG Practice Bulletin: Clinical Management Guidelines for Obstetrician-Gynecologist 534 (May 2003).

[4]A subchorionic hematoma is a type of blood clot found between the pregnancy membranes and the wall of the uterus.

¶11. At the hearing on Dr. Mills's motion for summary judgment, Hill's attorney asked Dr. Morrison:

> [W]ould it not be prudent to perform an ultrasound at [the time Hill presented to the emergency room with what appeared to be products of conception]? If you cannot palpate the uterus and you cannot be for certain you did not see a fetus in what was brought in, shouldn't you perform an ultrasound to verify your diagnosis?

Dr. Morrison responded, "no, ma'am, not necessarily." And when asked whether giving an ultrasound at that point in diagnosis is the standard of care, Dr. Morrison replied:

> It certainly *isn't* the standard of care. You can do the $150.00 test if you want to, but I usually do not. If I believe that it's a completed miscarriage and I believe in my heart if I had been given this information and she had presented to me, or any of my colleagues at University Medical Center, that's what we would have done. We would have said I'm so sorry; you've lost your baby.

Neither Dr. Morrison nor Dr. Fuselier presented any medical literature addressing the efficacy or error of Dr. Fuselier's opinion that Dr. Mills should have performed the ultrasound.

¶12. With respect to Dr. Fuselier's opinion that bed rest, surveillance, and tocolytic therapy could have extended Hill's 17 3/7-week pregnancy, Dr. Morrison testified:

> We could not have saved that baby . . . . There's no therapy for it. So if a baby's going to miscarry, it's because something is wrong with the baby or the placenta and it cannot survive . . . . there is absolutely nothing we can do. You have to put this in God's hands and if He carries the pregnancy or she carries the pregnancy, then that's fine, but we can't do anything . . . . doctors have tried for years, bed rest, giving you fluids, making you drink a lot of water, giving you hormones like progesterone, etc. We've never prescribed tocolytics but we've prescribed those other things and they do not work. And it's as simple as that . . . . But for them to think that they are doing something or that I'm doing something when we're really just fooling the patient, I think, is unconscionable. So you need to be honest with the patient and tell them and you only know that through the literature . . . . Now I will say back in the seventies when not as many of these studies had been done – most of these

6

studies that we're quoting that say it doesn't work have been done in the eighties and the nineties --and I was taught, we do bed rest, progesterone, all this stuff. We now know that doesn't work. So if you go back early enough, the sixties, seventies, fifties, I think that was the standard of care. After the eighties, it was not the standard of care to do that. Again, I don't mean to say that you **can't** do it, that you're below the standard of care to do it. What I'm saying is, that if you don't do it, that's not below the standard of care.

¶13. Although he produced no literature or authoritative publications contradicting Dr. Fuselier's opinion that the standard of care required Dr. Mills to perform an ultrasound, Dr. Morrison did produce substantial peer-reviewed industry literature[5] which contradicted Dr. Fuselier's opinion that Dr. Mills could have extended the pregnancy and possibly saved the life of the baby.

### *Motion to Recuse.*

¶14. Prior to proceeding with the hearing on Dr. Mills's motion to exclude Dr. Fuselier's opinions and the motion for summary judgment, the trial judge informed both parties that his court administrator had recently disclosed to him that Dr. Mills was her personal physician. After advising he would allow Hill's counsel one week to consider whether to file a motion for recusal, the trial judge proceeded with the hearing, following which he took Dr. Mills's motions under advisement.

¶15. Based upon the trial judge's disclosure concerning his court administrator – and the additional revelation that the trial judge's father was a physician who had practiced at King's

---

[5]Robert L. Goldenberg, M.D., *The Management of Preterm Labor, High-Risk Pregnancy: An Expert's View*, 43 American College of Obstetrics and Gynecology Practice Bulletin: Clinical Management Guidelines for Obstetricians-Gynecologists (May 2003); *Obstetrics in Broad Perspective*, Williams Obstetrics 1 (21st ed. 2001); *Abortion*, Williams Obstetrics 9 (22nd ed. 2005); *Preform Birth*, Williams Obstetrics 36 (22nd ed. 2005).

Daughters some ten years previously – Hill's counsel filed a motion for recusal which the trial judge denied, stating:

> I don't know if my father knows Dr. Mills because I've never talked to my father about this case or, quite frankly, any other case that's on my docket . . . . I thought he had retired in 1998. It's been at least ten years since he's practiced medicine in this community, and I don't think that my father having once been a physician in the community requires recusal. . . .[T]he only time I've ever seen Dr. Mills was when we had the motion hearing in Pike County a couple of months ago. I don't know his family; never met his family. And for the Record [sic], other than Ms. Brill telling me that Dr. Mills was her doctor, we have never more [sic] had a conversation in which Dr. Mills' name came up except with regard to scheduling in this case, and quite frankly, will never have a conversation in that regard.

¶16. Following his bench ruling denying Hill's motion for recusal, the trial judge requested from both parties proposed findings of fact and conclusions of law relative to Dr. Mills' motions. After receipt of the proposed findings of fact and conclusions of law, the trial judge granted Dr. Mills's motion to exclude Dr. Fuselier's testimony and his motion for summary judgment stating:

> [T]he plaintiff's expert has been unable to identify, produce or cite any scientific or peer review literature in support of his expert opinion. To the contrary, the testimony of Dr. John C. Morrison cites the *Management of Preterm Labor* from the ACOG Practice Bulletin, No. 43, May 2003, as well as *Williams Obstetrics*, 21st and 22nd Editions, which contradict the expert testimony of Dr. Fuselier. There is no evidence in the record of any medical treatise or journal which substantiates Dr. Fuselier's opinion. To the contrary, all medical literature produced in this cause contradicts Dr. Fuselier's opinion. For the foregoing reasons, as well as the considerable record in this case, the motion to exclude the expert testimony of Dr. Paul Fuselier and the defendant's motion for summary judgment are hereby granted.

¶17. Hill's counsel filed a motion for reconsideration of the summary judgment order, and for clarification as to whether her wrongful-death claim was the only claim that had been dismissed, and whether her other claims were still viable.

8

¶18. The trial judge issued a second memorandum order and judgment adopting *in toto* Dr. Mills's proposed memorandum order and judgment. The second memorandum order stated:

> While the opinions of Dr. Fuselier, that the standard of care required that an ultrasound be performed by Dr. Mills on May 27, 2002, under the exigent circumstances, is a matter in dispute, Dr. Fuselier's opinions that the standard of care required bed rest, pelvic rest and/or hydration for a threatened abortion and/or as to causality i.e. that bed rest, pelvic rest and/or hyrdration would have prolonged this pregnancy for any period of time, is not supported anywhere in the reliable medical literature submitted to this Court.

The order confirmed the summary judgment. Aggrieved, Hill timely filed her notice of appeal.

## ANALYSIS

¶19. Hill asserts the trial court erred in excluding Dr. Fuselier's expert testimony, in summarily dismissing all of her claims, and in refusing to recuse. In Mississippi, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact." Miss. R. Civ. P. 56(c). In addition, "a summary judgment motion is only properly granted when no genuine issue of material fact exists." *Jackson Clinic for Women v. Henley*, 965 So. 2d 643, 649 (Miss. 2007) (quoting *PPG Architectural Finishes, Inc. v. Lowery*, 909 So. 2d 47, 49 (Miss. 2005)).

¶20. This Court has held that, "after viewing the evidence in a light most favorable to the nonmoving party, this Court will only reverse the decision of the trial court if triable issues of fact exist." *Bowie v. Montfort*, 861 So. 2d 1037, 1041 (Miss. 2003) (citing *Travis v. Stewart*, 680 So. 2d 214, 216 (Miss. 1996)). In order to defeat a motion for summary

judgment, the party opposing the motion must set forth specific facts showing a genuine issue of material fact exists. *Id.* (citing *Drummond v. Buckley*, 627 So. 2d 264, 267 (Miss. 1993)).

¶21.    The general rule in medical-negligence claims is "that negligence cannot be established without medical testimony that the defendant failed to use ordinary skill and care." *Troupe v. McAuley*, 955 So. 2d 848, 856 (Miss.  2007) (quoting *Brooks v. Roberts*, 882 So. 2d 229, 232 (Miss. 2004)).   In *Troupe*, we held:

> To present a prima facie case of medical malpractice, a plaintiff, (1) after establishing the doctor-patient relationship and its attendant duty, is generally required to present expert testimony (2) identifying and articulating the requisite standard of care; and (3) establishing that the defendant physician failed to conform to the standard of care. In addition, (4) the plaintiff must prove the physician's noncompliance with the standard of care caused the plaintiff's injury, as well as proving (5) the extent of the plaintiff's damages.

*Troupe*, 955 So. 2d at 856 (quoting *Cheeks v. Bio-Medical Applications, Inc.*, 908 So. 2d 117 (Miss. 2005)).

¶22.    Applying *Daubert* and our Rule 702, the trial judge excluded all of Dr. Fuselier's opinions and, consequently, granted summary judgment to Dr. Mills on all issues.  Thus, we must first address whether the trial judge abused his discretion in excluding all of Dr. Fuselier's opinions.

### I.

¶23.    In addressing the *Daubert* issues, it is important to note at the outset that Dr. Fuselier opined that Dr. Mills had committed two basic errors, both of which (according to Dr. Fuselier) had breached the standard of care.  The first alleged error was that Dr. Mills did not perform an ultrasound on May 27, 2002.  The second was that, had Dr. Mills ordered bed rest, pelvic rest, and hydration, he could have extended the pregnancy.  If either of these

10

opinions was improperly excluded, and assuming there are material issues of triable fact as to whether such alleged negligence proximately caused damages, then summary judgment was inappropriate.

¶24. Our analysis must be guided by Rule 702, which addresses the admissibility of expert testimony:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702.

¶25. The United States Supreme Court has held that experts – unlike lay witnesses – are given a wide berth when offering opinions within their expertise. *Daubert*, 509 U.S. at 592. If the expert's testimony involves scientific, technical, or any other special knowledge, the trial judge – as gatekeeper – must determine whether the expert's opinions will help the trier of fact determine the issue in question. *Id*. at 589-591.

¶26. However, for expert opinions to qualify as scientific knowledge, the expert's testimony must be supported and based on what is known, and the expert must have knowledge that is more than subjective or unsupported speculation. *Id.* In that regard, the *Daubert* Court enumerated for a trial judge's consideration several factors,[6] the application

---

[6]The five non-exclusive factors include: 1) whether the expert's theory can be or has been tested; 2) whether the theory has been subjected to peer review and publication; 3) the known or potential rate of error of a technique or theory when applied; 4) the existence and maintenance of standards and control; and 5) the degree to which the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94.

11

of which in a particular case depends on the nature of the issue, the expert's expertise, and the subject of the testimony offered by the expert. *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 37 (Miss. 2003).

¶27.     The objective of the trial court's gate-keeping responsibilities pursuant to *Daubert* is to ensure the reliability and relevancy of expert testimony. *Kumho Tire Co. v. Patrick Carmichael*, 526 U.S. 137,152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).  It goes without saying that an unqualified expert's opinions are per se unreliable and, in that regard, we note that Dr. Mills presented the trial judge no challenge to Dr. Fuselier's qualifications as an expert in the fields of obstetrics and gynecology.  Dr. Mills attacks Dr. Fuselier's opinions, rather than his qualifications, and it is to those opinions that we now turn.

### Opinion regarding bed rest, pelvic rest, and hydration extending pregnancy.

¶28.     Dr. Fuselier opined that, had Dr. Mills given Hill the proper instructions, her baby possibly could have been saved.  Specifically, Dr. Fuselier stated that

> there is a great probability that with proper instruction, proper medication[,] proper surveillance that her pregnancy could have been extended. . . . Based on 25 years of obstetrical experience, residency training, et cetera, that given these circumstances, there is a great probability that the pregnancy could have been extended possibly to a point where there would be enough fetal maturity for the baby to survive.

Dr. Morrison disagreed with Dr. Fuselier on this point.  This disagreement appears at first blush simply to be a traditional "battle of the experts" which occurs when two experts have differing opinions.  This Court has held that the winner in a battle of the experts is to be decided by a jury. *See*, *e.g.*, *Bickham v. Grant*, 861 So. 2d 299, 307 (Miss. 2003).

¶29. However, Dr. Mills's challenge to Dr. Fuselier's opinion (that the pregnancy probably could have been extended) was not limited to Dr. Morrison's opposite opinion. Dr. Mills (through Dr. Morrison) also claimed that the opinion was not reliable because it was not accepted in the scientific community. In support of this claim, Dr. Morrison submitted substantial medical literature, including authoritative medical journals and texts (see note 5, *supra*), all of which contradicted Dr. Fuselier's opinion. In response to this attack on the reliability of his opinion, Dr. Fuselier presented nothing.

¶30. An expert whose opinions are under scrutiny may not ignore allegations of unreliability and nonacceptance within the scientific community, but rather must respond with some evidence that the opinions are, in fact, accepted within the scientific community. We said as much recently in *Smith v. Clement*, 983 So. 2d 285 (Miss. 2008), in which the plaintiff's expert – a highly qualified engineer – opined that certain copper tubing which caused a school bus fire was the same copper tubing that had been installed by the defendant fourteen years earlier. Had the defendant's expert simply disagreed, the case would have presented a battle of the experts. *Id*. at 289. However, the defendant's qualified expert not only disagreed with the plaintiff's expert, but also challenged the reliability of the opinion by testifying under oath that "there are no reliable, or valid, scientific principles or methods that could be utilized by any engineer, or any other specialist, that would enable that person to give [that opinion]." *Id.*

¶31. Thus, the defendant in *Smith* produced evidence through expert testimony that the plaintiff's expert opinion was unsupported within the scientific and engineering community. During the five-month period following this challenge to the reliability of her expert's

13

opinion, the plaintiff neither contradicted the evidence of unreliability nor offered any evidence of reliability or acceptance within the scientific or engineering communities. In other words, this challenge to the reliability of the expert opinion went unrebutted. "Thus, as to whether [the plaintiff's expert's] opinion was properly grounded in science, the only evidence before the trial court [at the summary judgment hearing] was [the defendant's expert's] affidavit, which clearly stated that it was not." *Id.* at 290.

¶32. In holding that the *Smith* trial judge properly excluded the expert's opinion, we stated that the plaintiff was on notice of the defendant's challenge to the reliability of her expert, and she had a fair opportunity to respond. Because she did not, we held the trial court did not abuse "its discretion in finding, from the evidence in the record, that [the plaintiff's expert's opinions] should be stricken." *Id.*

¶33. It is important to note that *Smith* did not present a traditional "battle of the experts." The plaintiff's expert opined that the copper pipe present when the bus caught on fire was the same copper pipe which was installed by the defendant fourteen years earlier. The defendant's expert did not dispute this assertion, but rather stated that there was no scientific way to tell. Such challenges to the reliability of expert opinions are squarely within the focus of *Daubert* and Rule 702 of the Mississippi Rules of Evidence.

¶34. Justice Chandler's disagreement with our holding today focuses on an expert's qualifications rather than acceptance (or lack thereof) of an expert's specific opinions within the scientific community. Were we to hold (as Justice Chandler's separate opinion suggests) that any qualified expert with twenty-five years experience may render any opinion – regardless of how contrary and repugnant that opinion may be to accepted science within the

14

discipline – we would return our courts to the pre-**Daubert** days when trials were tainted by unreliable junk science purchased from professional witnesses. We think the better practice is, when an expert (no matter how qualified) renders an opinion that is attacked as not accepted within the scientific community,[7] the party offering that expert's opinion must, at a minimum, present the trial judge with some evidence indicating that the offered opinion has some degree of acceptance and support within the scientific community.

¶35. Dr. Morrison provided a sworn affidavit and testimony with citations to peer-reviewed literature which explained in detail – not only that no scientifically reliable literature supported Dr. Fuselier's opinion regarding the efficacy of therapies to prolong the pregnancy – but also that all of the authorities and peer-reviewed literature was *to the contrary*.[8] As already stated, Dr. Fuselier presented nothing in response to this attack on the reliability of his opinion.

¶36. Indeed, Dr. Fuselier agreed that he could produce no support for his opinion, other than his own personal experience. Hill argued that Dr. Fuselier's experience should be enough, and that, in excluding Dr. Fuselier's testimony, the trial court applied a standard too rigid and restrictive to comply with **Daubert**. However, the trial court noted that Dr. Fuselier

---

[7]We again point out that an attack based on lack of acceptance within the scientific community (an issue for the trial judge) is not the same as one expert's opinion disagreeing with the opinion of another, which generally creates a dispute of fact to be decided by the jury. In other words, had Dr. Morrison simply said, "I disagree with Dr. Fuselier," no **Daubert** hearing or evaluation would have been necessary.

[8]We do not speak to the question of whether an expert must respond to an attack which says nothing more than that the scientific community is silent on the issue. Our opinion today – as in **Clement** – addresses an opinion under attack by the scientific community's rejection, and not mere silence.

was required to produce at his deposition any and all published or unpublished material supporting his opinions, and he produced none.

¶37.   The trial judge stated in his Memorandum Opinion and Order on April 9, 2008:

[T]he plaintiff's expert has been unable to identify, produce or cite any scientific or peer review literature in support of his expert opinion.  To the contrary, the testimony of Dr. John C. Morrison[9] cites the *Management of Preterm Labor* from the ACOG Practice Bulletin, No. 43, May 2003, as well as *Williams Obstetrics*, 21st and 22nd Editions, which contradict the expert testimony of Dr. Fuselier.  There is no evidence in the record of any medical treatise or journal which substantiates Dr. Fuselier's opinion. To the contrary, all medical literature produced in this cause contradicts Dr. Fuselier's opinion.

¶38.   Hill argues that, even though her expert could produce no peer-reviewed literature to support Dr. Fuselier's opinions, this alone should not render his opinions inadmissible.  In support of this argument, she cites *Poole v. Avara*, 908 So. 2d 716, 724 (Miss. 2005), in which we held that peer-reviewed literature is helpful when presented, but that peer-reviewed materials are not an absolute requirement, and their absence does not constitute automatic inadmissibility.

¶39.   We do not today retreat in any respect from our holding in *Poole*.  We find it completely distinguishable. Unlike the present case, the challenged opinion at issue in *Poole* had not been the subject of peer-reviewed articles.  Consequently, the defendant in *Poole* did not challenge the expert's opinions by producing peer-reviewed articles or authorities which contradicted the opinions.  Thus, *Poole* stands for the proposition that there exists no per se requirement that an expert's opinion be supported by peer-reviewed articles.

---

[9]Dr. Morrison testified that the standard of care based on the situation that occurred on May 27, 2002, did not warrant an ultrasound, especially where the vaginal bleeding had subsided, the cervical os was closed, and there were no fetal heart tones.

16

¶40. In contrast to ***Poole***, the subject matter of the expert opinion in the case before us today has been extensively explored and documented, and one hundred percent of documentation presented to the trial judge contradicts Dr. Fuselier's opinion. Thus, we cannot say that the trial judge abused his discretion in finding that, under Rule 702, Dr. Fuselier's opinions regarding available interventions to prolong Hill's pregnancy were unreliable and inadmissible.

¶41. We restate for emphasis that, when the reliability of an expert's opinion is attacked with credible evidence that the opinion is not accepted within the scientific community, the proponent of the opinion under attack should provide at least a minimal defense supporting the reliability of the opinion. ***Smith***, 983 So. 2d at 290. The proponent of the expert cannot sit on the side lines and assume the trial court will ignore the unrebutted evidence and find the expert's opinion reliable. ***Id.*** Were we automatically to allow introduction of expert opinions which are based upon nothing more than personal experience in cases where those opinions are contradicted in the scientific literature, we would effectively render Rule 702 and ***Daubert*** a nullity.

¶42. We hold the trial court did not abuse its discretion by excluding Dr. Fuselier's testimony regarding the efficacy of interventions to prolong Hill's pregnancy.

***Opinion regarding the ultrasound***.

¶43. Dr. Fuselier also testified that Dr. Mills had breached the standard of care by failing to perform an ultrasound on May 27, 2002. Dr. Morrison testified that the standard of care did not require Dr. Mills to perform an ultrasound. Thus, the trial court was presented with

17

contradictory opinions from two qualified experts. This presents what has been described above as the classic "battle of the experts" as to the ultrasound.

¶44.   At the ***Daubert*** hearing on Dr. Mills's motion for summary judgment, Dr. Mills's counsel stated:

> Now, it is contended that on that occasion Dr. Mills, even though he performed a pelvic exam, he should have performed an ultrasound. That is not before the Court today. That is a matter in dispute and while certainly it will be our position and our expert's testimony that that was not a deviation from the standard of care, that does come under rival opinions of experts and is not a subject of a ***Daubert*** motion.

Dr. Mills, while denying that failure to perform the ultrasound constituted negligence, argues that the unrebutted scientific literature clearly establishes that it would have made no difference, that is, the pregnancy could not have been prolonged. However, Dr. Mills does not allege that the scientific literature contradicts Dr. Fuselier's opinion.

¶45.   Dr. Mills's position is that, because Hill's baby could not have been saved, performing the ultrasound would have made no difference. However, this argument overlooks Hill's claims of damages which are unrelated to her wrongful-death claim. We glean from the complaint, the discovery, and Hill's presentation at oral argument that she claims Dr. Mills's failure to perform an ultrasound and discover that she was still pregnant deprived her of her right (despite the insurmountable odds) to try everything remotely possible to save her pregnancy. She also argues that Dr. Mills's failure to perform the ultrasound further deprived her of the option of choosing a less traumatic method of terminating the pregnancy, and that the events which occurred on the way to, and in, the emergency room on June 8, 2002, caused her avoidable mental anguish and emotional distress.

18

¶46. Specifically, she claims that – believing she was no longer pregnant – she vomited blood and was bleeding from her nose, and that she feared for her life on June 8. She claims that, while waiting for treatment in the emergency room (as opposed to the delivery suite in the hospital), she delivered a live, nineteen-week fetus, weighing 205 grams, and that she suffered mental anguish and emotional distress associated with being mentally and emotionally unprepared to deliver a live baby, only to have it die minutes later. Her theory is that, had Dr. Mills told her she was still pregnant on May 27, 2002 – even if he had told her there was no hope for the pregnancy – she would have had the option of preparing herself for the termination of the pregnancy and, even if she had chosen not to do so, she would have been prepared for what was to occur in the emergency room.

¶47. Without commenting on the merits of her claims, and given what was presented to the trial judge at the *Daubert* hearing,[10] we find Hill has articulated a cause of action for negligence which is separate and apart from her wrongful-death claim. Under the facts and circumstances of this case, the trial judge committed reversible error in holding that Dr. Fuselier could not testify that Dr. Mills had breached the standard of care by failing to perform an ultrasound. Consequently, the trial judge erred in granting summary judgment to Dr. Mills on this issue.

**II.**

---

[10]By our holding today, we take no position, one way or the other, on whether Dr. Fuselier's opinion (that Dr. Mills should have performed an ultrasound) meets the *Daubert* standard of reliability. That question was simply not before the trial court during the hearing, and it is not before us on appeal.

¶48. The final issue asserted by Hill concerns the matter regarding the trial judge's failure to recuse himself. Hill asserts that – under Mississippi Rule of Civil Procedure 16A,[11] Rule 1.15 of the Uniform Circuit and County Court Rules,[12] and Cannon 3(E) of the Code of Judicial Conduct[13] – the trial judge should have recused himself. Hill further asserts that the trial judge should have recused himself because his father had been a practicing physician in the area, and had at one point practiced at King's Daughters.

¶49. This Court has held that the decision to recuse or not is one left to the sound discretion of the judge. *Collins v. Joshi*, 611 So. 2d 898, 901 (Miss. 1992) (citing *Nationwide Mut. Ins. Co. v. Evans*, 553 So. 2d 1117, 1119 (Miss. 1989)). The test set forth in determining whether a judge should recuse is: "Would a reasonable person, knowing all of the circumstances, harbor doubts about the judge's impartiality?" *Copeland v. Copeland*, 904 So. 2d 1066, 1071 (Miss. 2004) (quoting *In re Conservatorship of Bardwell*, 849 So. 2d 1240, 1247 (Miss. 2003); *Bredemeier v. Jackson*, 689 So. 2d 770, 774 (Miss. 1997)).

¶50. Hill has failed to produce any evidence regarding either allegation of impropriety. This Court has more than once held that the party requesting the judge's recusal must

---

[11]"Motions seeking the recusal of judges shall be timely filed with the trial judge and shall be governed by procedures set forth in the Uniform Rules of Circuit and County Court Practice . . ." Miss. R. Civ. P. 16A.

[12]"Any party may move for the recusal of a judge of the circuit or county court if it appears that the judge's impartiality might be questioned by a reasonable person knowing all the circumstances, or for other grounds provided in the Code of Judicial Conduct or otherwise as provided by law. . . ." Miss. Unif. Cir. & Cty. R. 1.15.

[13]"Judges should disqualify themselves in proceedings in which their impartiality might be questioned by a reasonable person knowing all the circumstances . . . . " Canon 3(E)(1), Miss Code of Judicial Conduct.

produce evidence that would demonstrate a reasonable doubt as to a judge's impartiality. ***Id.*** (*quoting* **Dodson v. Singing River Hosp. Sys.**, 839 So. 2d 530, 533 (Miss. 2003)).

¶51.   Hill produced no evidence that the court administrator had any material input into the court's judicial decisions. The relationship between a court administrator and a judge differs from one to the next, and Hill submitted no evidence that the relationship between the trial judge in this case and his court administrator was anything more than a typical employer/employee relationship, or that his court administrator influenced his judicial decisions.

¶52.   Additionally, Hill argues that recusal was necessary because the trial judge's father's had a previous professional relationship with King's Daughters. Hill argues that the trial judge's family connection to the local medical community could make a reasonable person believe bias exists. However, at the time of the hearing, King's Daughters was no longer a named defendant in the suit against Dr. Mills.[14]  In addition, the trial judge's father had retired from practicing medicine in 1998, and Hill failed to show any reason why a reasonable person could see a potential bias after ten years.

¶53.   For these reasons, it is the opinion of this Court that the trial judge did not abuse his discretion in denying Hill's motion for recusal.

**CONCLUSION**

¶54.   For the foregoing reasons, we hold that the trial judge did not abuse his discretion by excluding the medical testimony of Dr. Fuselier regarding the efficacy of any therapies to extend the pregnancy, but that he did err by excluding the testimony regarding Dr. Mills's

---

[14]King's Daughters Medical Center was dismissed on November 8, 2007.

21

alleged negligence in failing to perform an ultrasound.  Because Hill could not establish any of the required elements of her wrongful-death claim without expert testimony, the dismissal of that claim was proper.

¶55.    However, because the reliability of Dr. Fuselier's opinion that Dr. Mills should have performed an ultrasound was unchallenged, the trial judge erred in excluding that testimony, and further erred in granting summary judgment on Hill's claims for damages unrelated to wrongful death.

¶56.    Finally, we find the trial court did not abuse its discretion in denying Hill's motion for recusal.  Accordingly, we reverse the trial court in part, and remand this matter for further proceedings consistent with this opinion.

¶57.    **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**CARLSON, P.J., RANDOLPH, LAMAR, KITCHENS AND PIERCE, JJ. CONCUR. WALLER, C.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION.  CHANDLER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, P.J.**

**WALLER, CHIEF JUSTICE, SPECIALLY CONCURRING:**

¶58.    I agree with the result reached by the majority.  I am compelled to write because of what I believe to be a misplaced reliance on *Smith v. Clement*, 983 So. 2d 285 (Miss. 2008).

¶59.    The majority relies heavily on *Smith* to support its finding that the trial court did not abuse its discretion in excluding Dr. Fuselier's testimony regarding the efficacy of interventions to prolong Hill's pregnancy.  Citing *Smith*, the majority states that "when the reliability of an expert's opinion is attacked with credible evidence that the opinion is not accepted within the scientific community, the proponent of the opinion under attack should

22

provide at least a minimal defense supporting the reliability of the opinion." I fully agree. But *Smith* does not provide support for this reasoning.

¶60. In *Smith*, the defendant's expert challenged the plaintiff's expert's opinion as not being supported by sound scientific principles. *Smith*, 983 So. 2d at 287. But the defendant's expert offered no scientific principles or other evidence to support this attack—it was merely one expert's opinion versus another expert's opinion. *Id.* at 290-92 (Waller, P.J., dissenting). There was no "credible evidence" attacking the plaintiff's expert's opinion. *Id.*

¶61. Here, in contrast, Dr. Morrison offered credible evidence to attack Dr. Fuselier's assertions that certain therapies could have prevented Hill's spontaneous abortion. Dr. Morrison presented ample peer-reviewed literature to refute Dr. Fuselier's opinion on this point. Dr. Fuselier failed to rebut this challenge with a minimal defense to support the reliability of his opinion.

¶62. Because of the factual differences between the two cases, I find nothing inconsistent with my dissent in *Smith* and my concurrence in this case. I find the majority's reliance on *Smith* to be unfounded.

**CHANDLER, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶63. I concur with the majority, with the exception that I would reverse the trial court's exclusion of the testimony of Dr. Paul G. Fuselier as to wrongful death and the grant of summary judgment on Hill's wrongful-death claim. Dr. Fuselier testified that, if Hill's pregnancy had been diagnosed when she presented at the hospital with bleeding and cramping on May 27, 2002, the standard of care would have required Dr. Mills to admit Hill to the

hospital and order bed rest, pelvic rest, hydration, and tocolytic drugs to prevent labor contractions. Dr. Fuselier testified to a reasonable degree of medical probability that, had these measures been implemented, Hill's pregnancy could have been extended to the point of viability. Dr. Fuselier rendered these opinions based upon his twenty-five years of experience as an obstetrician and gynecologist, and the defense never challenged his qualifications as an expert in the field.

¶64. This Court has adopted the modified *Daubert* standard for the admission of expert testimony. *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 39 (Miss. 2003) (citing *Daubert v. Merrill Dow Pharms.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed 2d 238 (1999)). This standard requires the trial court to perform a two-pronged analysis to determine whether expert testimony is admissible under Mississippi Rule of Evidence 702. *Id.* at 38. First, the proffered expert testimony must be relevant, that is, it must "assist the trier of fact." *Id.* (quoting *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002)). Second, the proffered testimony must be reliable. *Id.*

¶65. The trial court's application of this two-pronged analysis is "fact-specific and appropriately uses relevant factors to determine reliability." *Id.* (citing *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999)). The five factors that the trial court must consider, if relevant to determine reliability in the particular case, include: (1) "whether the theory or technique can be and has been tested;" (2) "whether it has been subjected to peer review and publication;" (3) "whether, in respect to a particular technique, there is a high known or potential rate of error;" (4) "whether there are standards controlling the technique's

24

operation;" and (5) "whether the theory or technique enjoys general acceptance within a relevant scientific community." *Id.* at 37 (quoting *Daubert*, 509 U.S. at 592-94). These factors are nonexhaustive, and the trial court may deem these or other factors relevant in a particular case "depend[ing] on the nature of the issue, the expert's particular expertise, and the subject of the testimony." *Id.* (citing *Kumho Tire*, 526 U.S. at 151); *see Poole v. Avara*, 908 So. 2d 716, 723 (Miss. 2005).

¶66.    In evaluating reliability, the ruling court's focus must remain "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Expert testimony is inadmissible if the party proffering the testimony fails to demonstrate that it is scientifically grounded. *Adcock v. Miss. Transp. Comm'n*, 981 So. 2d 942, 947 (Miss. 2008). "Scientific knowledge means something more than unsupported speculation or subjective belief that is grounded in methods and procedures of science." *Poole*, 908 So. 2d at 723 (citing *Daubert*, 509 U.S. at 595). While the existence of favorable peer review and publication is a relevant consideration, it is not dispositive of an opinion's admissibility. *Daubert*, 509 U.S. at 594. In *Poole*, this Court held that the trial court properly admitted a physician's causation theory in the absence of peer review and publication because the theory constituted a medical opinion, not "mere conjecture akin to astrology." *Poole*, 908 So. 2d at 723.

¶67.    The majority finds that the trial court properly excluded Dr. Fuselier's opinions because the peer-reviewed articles submitted by Dr. Mills contradicted those opinions. The majority further finds that, under *Smith v. Clement*, 983 So. 2d 285, 290 (Miss. 2008), Hill was required to rebut Dr. Mills's challenge to Dr. Fuselier's testimony with "at least a

25

minimal defense supporting the reliability of the opinion." Maj. Op. at ¶41. In *Smith*, this Court affirmed the trial court's exclusion of testimony by the plaintiff's expert, Dr. Forbes, based upon an affidavit of the defense expert, Nolen, which stated that Dr. Forbes's opinions were not properly grounded in science. *Id.* at 289-90. The Court found that the only evidence on reliability before the trial court had been Nolen's affidavit. *Id.* at 290. The Court stated that the plaintiff should have submitted rebuttal evidence supporting the reliability of Dr. Forbes's opinions, such as a denial of the accuracy of Nolen's affidavit. *Id.* In dissent, Chief Justice Waller wrote that the trial court's finding that Dr. Forbes's opinion was unreliable was itself based upon the unsubstantiated opinion of the opposing expert. *Id.* (Waller, C.J., dissenting). In Chief Justice Waller's opinion, the trial court "simply took [Nolen's] word over that of Dr. Forbes," although the conflicting affidavits actually created a fact question for the jury. *Id.* at 291-92. I agree with this analysis.

¶68. I agree with Chief Justice Waller's analysis of the admissibility of Dr. Forbes's testimony in *Smith*. Further, I believe that *Smith* should not be construed as engrafting a burden-shifting scheme upon *Daubert*'s reliability prong. *Smith* should stand for no more than the proposition that, while there is no requirement that a plaintiff rebut a defense challenge to the reliability of proffered expert testimony, further development of the medical evidence is encouraged when reliability is legitimately cast into doubt. The order in which the evidence is presented to the trial court should have no bearing upon the trial court's assessment of the reliability of proffered expert testimony.

¶69. I turn to the proffered expert testimony in this case. Dr. Fuselier's opinion was that, based on his twenty-five years of experience as an obstetrician, to a reasonable degree of

26

medical probability, the administration of bed rest, pelvic rest, hydration, and tocolytic drugs could have extended Hill's pregnancy to the point of viability. This opinion conflicted with that of Dr. Morrison, which was supported by peer-reviewed articles, that these measures would not have been effective. The peer-reviewed literature submitted by Dr. Mills stated that bed rest, pelvic rest, and hydration are commonly prescribed by obstetricians in an effort to prevent preterm delivery. Even Dr. Mills testified that, had he discovered Hill's pregnancy on May 27, 2002, he would have placed Hill on pelvic rest, although he denied that this measure would have had any beneficial effect in preventing her subsequent miscarriage.

¶70. I believe that Dr. Fuselier's testimony met the threshold requirements for reliability under the modified **Daubert** test, and that the trial court abused its discretion by excluding his testimony. Dr. Fuselier's opinion on the effectiveness of bed rest, pelvic rest, hydration, and tocolytics is grounded in scientific validity because it is based upon his twenty-five years of experience treating obstetrical patients. Dr. Fuselier's opinion is based upon the outcomes he had observed in the course of his experience as a qualified medical expert, not upon "unsupported speculation" or "mere conjecture." *See Adcock*, 981 So. 2d at 947; *Poole*, 908 So. 2d at 723. Moreover, there was ample evidence that bed rest, pelvic rest, and hydration, measures advocated by Dr. Fuselier, are commonly ordered by obstetricians in an effort to prevent preterm delivery, indicating the general acceptance of these treatments by the medical community. Certainly, the support of peer-reviewed articles might have caused a jury to afford more weight to Dr. Morrison's testimony than to that of Dr. Fuselier. However, "the reasonableness of an expert's opinion and the weight to be afforded thereto" are always questions of fact for the jury. *Daniels v. GNB, Inc.*, 629 So. 2d 595, 602 (Miss. 1993).

*Daubert* instructs that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. For these reasons, I would reverse the exclusion of Dr. Fuselier's testimony and the grant of summary judgment on Hill's wrongful-death claim.

**GRAVES, P.J., JOINS THIS OPINION.**