# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-00931-COA

**VALERIE J. YERKS, INDIVIDUALLY AND ON BEHALF OF HER MINOR SON**

v.

**ELIZABETH A. TREST, M.D. AND WOMAN'S GROUP OF MERIDIAN PLLC**

APPELLANT

APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 05/26/2016 |
| TRIAL JUDGE: | HON. JUSTIN MILLER COBB |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | BRADLEY S. CLANTON |
| ATTORNEYS FOR APPELLEES: | JAMES H. HEIDELBERG |
| | RICHARD WILLIAM FRANKLIN |
| | WHITMAN B. JOHNSON III |
| | APRIL LEIGH MCDONALD |
| | LORRAINE WALTERS BOYKIN |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 06/12/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J, BARNES AND TINDELL, JJ.**

**LEE, C.J., FOR THE COURT:**

¶1.     In this medical-malpractice case, we must determine whether the trial court erred when it granted Dr. Elizabeth Trest's and Woman's Group of Meridian's motions for summary judgment, finding that Valerie Yerks's medical expert failed to establish the necessary element of causation.  Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     On January 2, 2004, Yerks, who was 40-weeks pregnant, was seen by her OBGYN, Dr. Trest, at Woman's Group of Meridian.  Dr. Trest evaluated Yerks at the clinic, and then

sent her to Riley Memorial Hospital for an additional work-up. She then determined that Yerks's labor should be induced because she was a few days past 40-weeks gestation and had oligohydramnios, or low amniotic fluid. Yerks was admitted to the hospital and her labor induced on January 2, 2004, around 4:30 p.m. External fetal monitoring was performed throughout the labor and at times revealed heart decelerations (decreased or drop in heart rate) and bradycardia (slow heart rate). Dr. Trest was informed by medical staff via phone of Yerks's symptoms and progress throughout the labor including the decelerations and bradycardic heartrate. Yerks went into active labor around 1:00 a.m. on January 3, 2004, and complete cervical dilation occurred at 4:05 a.m. Dr. Trest arrived to the hospital at 4:26 a.m., and delivered the baby at 4:43 a.m. via vacuum-assisted extraction. Yerks gave birth to a male child, Tyler,[1] weighing 7 pounds 9 ounces.

¶3.     After Tyler was born, it was noted that he suffered from macrocephaly (abnormally large head); severe hearing loss (profound deafness); and optic nerve hypoplasia with nystagmus (legal blindness).

¶4.     On December 29, 2011, Yerks, individually and on behalf of her minor son, Tyler, filed a complaint for medical negligence against Dr. Trest and Woman's Group (collectively "Dr. Trest").[2] Yerks claimed that Dr. Trest committed medical negligence by failing to properly monitor and provide appropriate medical treatment during Yerks's labor and Tyler's

---

[1] A fictitious name is used to protect the identity of the minor child.

[2] Yerks also named Riley Memorial Hospital, now Anderson Regional Medical Center, and Health Management Associates Inc. as defendants to the lawsuit. Those parties were dismissed while the case was before the trial court and are not parties to this appeal.

2

birth, causing Tyler's life-long injuries, including deafness; vision impairment; walking disability; and emotional, behavioral, and intellectual disability.

¶5.     On November 21, 2013, after various motions to dismiss and motions for summary judgment, the parties stipulated that Yerks's individual claims were time-barred, and the trial court entered an order accordingly.  The trial court also found that Dr. Trest's motion for summary judgment was premature and additional discovery was necessary.  The summary-judgment motions were held in abeyance until discovery was complete.  On May 26, 2016, the trial court, finding that Yerks failed to establish the essential element of causation, issued a memorandum opinion and order granting summary judgment in favor of Dr. Trest.  From this order, Yerks, on behalf of Tyler, now appeals.

## STANDARD OF REVIEW

¶6.     "A trial court's grant of summary judgment is reviewed de novo." *Johnson v. Pace*, 122 So. 3d 66, 68 (¶8) (Miss. 2013).  "Summary judgment is proper if 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id*. (quoting M.R.C.P. 56(c)).  "The evidence must be viewed in the light most favorable to the party opposing the motion." *Id*.

## DISCUSSION

¶7.     The trial court granted Dr. Trest's motion for summary judgment based on the ground that Yerks failed to establish the essential element of causation between Dr. Trest's alleged negligence and Tyler's injuries.  "In a medical[-]malpractice case, as in all claims for

negligence, causation must be proven in order to establish a prima facie case." *Hubbard v. Wansley*, 954 So. 2d 951, 964 (¶42) (Miss. 2007).

¶8.    "A plaintiff in a medical-malpractice case has the burden of proving '(1) the existence of a duty by the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) a failure to conform to the required standard; and (3) an injury to the plaintiff proximately caused by the breach of such duty by the defendant.'" *Johnson*, 122 So. 3d at 68 (¶8) (quoting *Hubbard*, 954 So. 2d at 956-57 (¶12)).    "Expert testimony establishing these elements generally is required for the nonmoving party to survive summary judgment." *Id*. "Not only must this expert identify and articulate the requisite standard that was not complied with, the expert must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries." *Id*. (quoting *Barner v. Gorman*, 605 So. 2d 805, 809 (Miss. 1992)).

¶9.    The trial court found that Yerks was unable to establish the essential element of causation because Yerks's expert, Dr. Kevin Stephens, testimony regarding causation was unreliable and therefore, inadmissible.    "In regard to the admissibility of expert witness testimony, the trial judge is to act as a gatekeeper, ensuring that expert testimony is both relevant and reliable." *Barrow v. May*, 107 So. 3d 1029, 1035 (¶14) (Miss. Ct. App. 2012) (internal quotation mark omitted).    "A trial court's admission or exclusion of expert testimony is reviewed for abuse of discretion." *Worthy v. McNair*, 37 So. 3d 609, 614 (¶13) (Miss. 2010). "The trial court's decision will stand unless the reviewing court concludes that the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion." *Id*.

4

¶10. In his affidavit and deposition, Dr. Stephens opined that Dr. Trest committed multiple breaches of the standard of care by failing to properly monitor Tyler's symptoms throughout Yerks's labor and delivery; failing to perform a cesarean-section delivery; and using the vacuum extractor in light of the fetal heart rate and oligohydramnios. Dr. Stephens further opined that he believed these multiple breaches contributed to or caused Tyler's injuries, including macrocephaly, deafness, and blindness. Dr. Trest challenged Dr. Stephens's opinions regarding causation as unreliable, and therefore inadmissible. Specifically, Dr. Trest challenged Dr. Stephens's opinion as contrary to the scientific and medical community.

¶11. Yerks argues that this case is a "battle of the experts" presenting a question to be resolved by the jury. However, "[a]n attack based on lack of acceptance within the scientific community (an issue for the trial judge) is not the same as one expert's opinion disagreeing with the opinion of another, which generally creates a dispute of fact to be decided by the jury." *Hill v. Mills*, 26 So. 3d 322, 331 (¶134) n.7 (Miss. 2010). In this case, Dr. Trest specifically attacks Dr. Stephens's opinion on causation as not accepted within the scientific and medical community and contrary to peer-reviewed literature on the subject matter.

¶12. In Mississippi, "[m]edical experts are not required to support their opinions with medical literature." *Mem'l Hosp. at Gulfport v. White*, 170 So. 3d 506, 509 (¶12) (Miss. 2015). But, "[a]n expert whose opinions are under scrutiny may not ignore allegations of unreliability and nonacceptance within the scientific community, but rather must respond with some evidence that the opinions are, in fact, accepted within the scientific community." *Hill*, 26 So. 3d at 330 (¶30). "[W]hen an expert (no matter how qualified) renders an opinion

that is attacked as not accepted within the scientific community, the party offering that expert's opinion must, at a minimum, present the trial judge with some evidence indicating that the offered opinion has some degree of acceptance in the scientific community." *Mem'l Hosp.*, 170 So. 3d at 509 (¶12) (quoting *Hill*, 26 So. 3d at 331 (¶34)).

¶13. In the instant case, Dr. Trest attacked Yerks's expert's opinion as not accepted within the scientific or medical community. Dr. Stephens testified that the several alleged breaches of standard of care resulted in a traumatic birth event, stating that "part of the birth trauma contributed to his neurological deficits" and that "the total experience of the infant in the delivery process . . . was traumatic." Specifically, Dr. Stephens testified that:

> With the loss of fluid in the labor process, you can have either head compression or cord compression. And the prolonged severe head compression and cord compression can lead to fetal bradycardia or placenta insufficiency, which can cause fetal distress, which can cause sequelae in terms of neurological sequelae.

> [I]t started off with the reduced amniotic fluid. And with reduced amniotic fluid, there appeared to have been both head compression and cord compression, which contributed to the change in the fetal baseline heart rate, and which then progressed to the deceleration -- the heart decelerations, and that remained until the delivery. And along -- when you add vacuum extraction on top of that, then that contributed even more so towards the neurological deficits.

¶14. Dr. Trest challenged these opinions as unreliable and not scientifically or medically accepted. To support the challenge, Dr. Trest presented affidavit testimony from several medical experts.

¶15. Dr. Stephens had stated that the placenta-pathology report showed small areas of fibrosis, calcification, and scattered hyalinized villi, which "could be somewhat

6

problematic[,] I'm not sure." But upon further questioning, Dr. Stephens admitted he would defer to a placental pathologist. One of Dr. Trest's experts, Dr. Carolyn Salafia, a placental pathologist, board certified in pediatric pathology and anatomic and clinical pathology, reviewed tissue samples from the placenta and testified that "the placenta does not reveal edema, congestion, hemorrhage, or capillary bursting which is what one would see if there had been abnormal pressure on the cord as opined by plaintiff's expert." She further opined, "This event was not a birth trauma case as alleged by the plaintiff's expert and plaintiff's causation theories are wrong and not supported by the placental pathology."

¶16. Dr. Stephens had also opined that with low amniotic fluid "you can have head compression . . . which can cause fetal distress . . . which can cause . . . neurological sequelae." But, Dr. Stephens admitted he had not looked at any of Tyler's brain-imaging studies and would defer to a board-certified pediatric neuroradiologist to interpret those imaging studies. In response, Dr. Trest submitted the affidavit of Dr. Robert Zimmerman, a professor of radiology who is board certified in radiology and neuroradiology. Dr. Zimmerman's affidavit stated that "nothing in the images suggest an injury as described by [Dr. Stephens]." After reviewing Tyler's medical records, including MRI and CT scans, Dr. Zimmerman opined that:

> For a term infant with partial or prolonged asphyxia to explain the clinical symptoms, certain anatomical conditions will be seen on the radiological imaging. Those conditions do not appear on [Tyler's] radiological images. This effectively rules out hypoxic and ischemic brain insult to [Tyler] at birth and rules out a birth trauma case as alleged by the plaintiff's expert.

¶17. Dr. Trest also submitted the affidavits of Dr. Jay Goldsmith, a professor of pediatrics

7

specializing in neonatal medicine and neonatal-perinatal medicine; Dr. Aubrey Milunsky, a board certified physician in internal medicine, pediatrics, and clinical genetics; and Dr. Elias G. Chalhub, a pediatric neurologist. These experts' affidavits, together with supporting medical literature, also challenged the reliability of Dr. Stephen's opinions as contrary to the scientific and medical community, and contrary to the evidence in the case. Upon review of these affidavits, the trial court noted the following:

> Dr. Elias G. Chalhub, M.D. . . . offer[ed] the opinion that the medical records indicate the child's Apgar scores of 8/8 at 5 minutes which negates any opinion of a significant hypoxic event having occurred. This opinion is supported by medical literature.
>
> According to *Executive Summary: Neonatal Encephalopathy*, submitted by Defendants in support of their motion for summary judgment, "if the Apgar score at 5 minutes is greater than or equal to 7, it is unlikely that peripartum hypoxic-ischemia played a major role in causing neonatal encephalopathy." Dr. Stephens agreed with this statement in his deposition and also agreed that [Tyler's] Apgar score at 5 minutes was greater than 7. . . . However, when asked if that meant it was unlikely that peripartum hypoxic-ischemia played a major role in causing [Tyler's] neonatal encephalopathy, Dr. Stephens disagreed stating "not in this case." . . . Dr. Stephens gave no further explanation as to why it was not unlikely "in this case."
>
> . . . .
>
> Dr. Goldsmith opined that [Tyler's] condition is not related to and is inconsistent with an acute intrapartum hypoxic event. The Apgar scores, the cord blood gasses and the MRI scans of the brain are inconsistent with an acute intrapartum hypoxic event. Dr. Goldsmith stated this event was not a birth trauma case and the causation theories asserted by Plaintiff are unsupported by peer reviewed literature.
>
> . . . .
>
> Dr. Milunsky state[d] he w[ould] testify regarding the laboratory work, blood work, the Apgar test results and the results of the cord blood gas, all of which dispute plaintiff's theory as to causation. Dr. Milunsky also opined that this

8

event was not a birth trauma case and Plaintiff's theories as to causation are unsupported by the peer review literature.

The trial court found that "these affidavits . . . corroborate[d] [Dr. Trest's] argument that Dr. Stephens['s]" opinion [was] contrary to the scientific community and not supported by peer reviewed literature." The trial court also found that these experts' opinions were aligned with the peer-review medical literature submitted in support of the opinions.

¶18.    For both his affidavit and deposition, Dr. Stephens cited *Clinical Obstetrics: A Public Health Perspective* (Benjamin P. Sachs & David Acker eds., 1986), as the basis for his opinion testimony. However, the document was not part of the record before the trial court, and Yerks did not submit it for the court to review whether it supported Dr. Stephens's opinions as reliable, or scientifically and medically sound. Dr. Stephens also cited to Marlene M. Corton et al., *Williams Obstetrics* (23d ed. 2009), but the trial court found that the document only discussed the standard of care, not causation, and that the document actually supported the opinions advanced by Dr. Trest's experts and their supporting medical literature.

¶19.    Additionally, as the trial court noted in its opinion, Dr. Stephens repeatedly responded with "I don't know" when questioned about the causation of Tyler's specific impairments:

> When questioned as to what caused [Tyler's] impairments during his deposition, Dr. Stephens could not specifically identify the cause(s). Dr. Stephens was asked what caused [Tyler's] severe hearing loss. Dr. Stephens testified "I don't know." . . . Dr. Stephens was asked what caused [Tyler's] optic nerve hypoplasia with nystagmus or blindness. Dr. Stephens testified "I'm not sure what caused it." . . . Further, Dr. Stephens testified "the hypoplasis is the failure to develop. The active birth process is most likely not related to that formulation of hypoplasia." . . . Dr. Stephens went on to testify that "I'm not sure what caused the severe vision and hearing loss, but I can say

hypoxic episodes can contribute to it."

¶20. Again, "when the reliability of an expert's opinion is attacked with credible evidence that the opinion is not accepted within the scientific community, the proponent of the opinion under attack should provide at least a minimal defense supporting the reliability of the opinion." *Hill*, 26 So. 3d at 332-33 (¶41). "The proponent of the expert cannot sit on the side lines and assume the trial court will ignore the unrebutted evidence and find the expert's opinion reliable." *Id.* Here, Yerks failed to contradict the evidence of unreliability and failed to offer any rebuttal evidence of reliability or acceptance of Dr. Stephens's opinions within the scientific and medical community. The trial court found that Dr. Stephens's opinions were "nothing more than mere speculative testimony, unsupported by any of the evidence presented." Consequently, the trial court found Dr. Stephens's testimony regarding causation was unreliable and therefore inadmissible.

¶21. After reviewing the record and the evidence before the trial court, which demonstrated a significant probative challenge to the reliability of Dr. Stephens's expert opinion, along with Yerks's failure to come forward with any rebuttal evidence to dispute the challenge or otherwise support the reliability of Dr. Stephens's opinion, we find that the trial court did not abuse its discretion in finding that Dr. Stephens's testimony as to causation was unreliable, and as a result, inadmissible.

¶22. In medical-malpractice cases, as is the case here, "expert testimony is generally required to survive summary judgment." *Cates v. Woods*, 169 So. 3d 902, 909 (¶20) (Miss. Ct. App. 2014). Because Dr. Stephens's testimony as to causation was excluded as

10

unreliable, Yerks failed to establish a prima facie case of medical malpractice and failed to present evidence sufficient to create a genuine issue of material fact as to causation. Therefore, the trial court did not err in granting summary judgment. Accordingly, we affirm.

¶23. **AFFIRMED.**

**IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON, GREENLEE AND TINDELL, JJ., CONCUR. WESTBROOKS, J., NOT PARTICIPATING.**