ROBERTS, J.,
for the Court:
¶ 1. This appeal stems from the Hinds County Circuit Court’s grant of a directed verdict in a medical malpractice, wrongful death suit against Dr. Reul May Jr., an oral surgeon, brought by Mary Barrow (Barrow), the mother and legal representative for Latisha Barrow (Latisha), on behalf of herself, the heirs of Latisha, and Latisha’s estate. Immediately prior to granting Dr. May’s motion for a directed verdict, the circuit court granted Dr. May’s Daubert motion because the expert witness’s testimony on causation was speculative.[1] Barrow filed a motion for a new trial on August 20, 2010, and the circuit court denied her motion on September 22, 2010.
FACTS AND PROCEDURAL HISTORY
¶ 2. In 2003, Latisha, at the age of nineteen, was diagnosed with severe congestive heart failure (CHF), an enlarged heart, and an abnormal enlargement of the liver. She was treated with medication and by cardiologists in Greenville and at the University of Mississippi Medical Center (UMMC), but her condition continued deteriorating. By 2006, Latisha was told she had end-stage CHF. Latisha suffered from the disease of idiopathic dilated cardiomyo-pathy, which results in an enlarged heart that does not pump properly. Idiopathic means spontaneous or arising from an unknown cause. As a result, the pumping of the heart gets weaker, the blood circulation slows, and the heart becomes too weak to circulate blood properly. In January of 2006, Dr. Charles Moore, a cardiologist at UMMC, urged Latisha to have an internal-cardiac defibrilator (ICD) implanted due to her high risk of sudden death. The ICD would provide an electric jolt to her heart if a potential deadly arrhythmia occurred. Latisha declined having the ICD implanted, citing cosmetic concerns. Her cardiologist in Greenville testified that Latisha’s mortality rate as of June 7, 2006, was fifty percent at six months and fifty percent at another six months. Needless to say, it was undisputed that in July 2006, Latisha was at a very high risk of sudden death due to arrhythmia related to her CHF.
¶ 3. On March 17, 2006, UMMC physicians evaluated Latisha about the efficacy of a heart transplant. Prior to being eligible for a heart transplant, Latisha would *1032 be required to have the ICD implanted and have her third molars, commonly known as “wisdom teeth,” removed. Latisha’s home-town dentist recommended Dr. May as an oral surgeon. Dr. May practices in an office setting and does not have surgical privileges at a hospital. During the consultation visit approximately twenty-two days prior to the procedure, Dr. May took a panorex x-ray of Latisha’s teeth and took her health history, including that she had CHF. Dr. May also noted that he would not go forward until he consulted with Dr. Moore, Latisha’s cardiologist at UMMC. Dr. Moore sent Dr. May a written consultation letter on June 28, 2006, giving permission to proceed with the surgery. The letter noted that Dr. May should premedicate Latisha with antibiotics before the procedure, minimize the use of epinephrine in the local anesthetic, and use low-dose systemic sedation as needed. Additionally, Dr. Moore noted that the extraction of the wisdom teeth posed a “mild risk for hemodynamic instability (abnormal or unstable blood pressure),” but “given the possible need for transplantation, the potential outweighs the risk.” Dr. Moore’s letter did not provide any information about whether the procedure should be done in a hospital or any post-surgical monitoring and care that should occur.
¶ 4. Latisha’s dental surgery was scheduled for July 14, 2006. Earlier that day, Latisha was seen by Dr. John Payne, a cardiac electrophysiologist at UMMC, concerning the implantation of the ICD. Dr. Payne’s notes indicated that Latisha had typical symptoms of volume overload because she had too little pump function. He also noted that her blood pressure was abnormally low but that Latisha had a history of clinically based low blood pressure. In addition to her appointment with Dr. Payne, Latisha visited with a heart-transplant recipient named Liz Carpenter to discuss all aspects of the transplantation process. Latisha had previously expressed concern over the heart-transplant process because she “was scared to have someone else’s heart” and because the medication following the transplant would cause weight gain.
¶ 5. Dr. May testified that, either at the consultation meeting or prior to the surgery that day, he had discussed the risks and complications of the surgery with Latisha. Latisha signed a document stating she was giving her informed consent to the dental procedure. Upon arrival at Dr. May’s office, Latisha appeared to be “a little weak,” but Dr. May determined he could still proceed with surgery. Latisha was given oxygen and was injected with local anesthesia. After being injected with the local anesthesia, Latisha told Dr. May’s staff she was feeling a little sick; his staff washed Latisha’s face with cold water, put her back on oxygen, and noted that Latisha responded well to that. The forty-five-minute procedure was completed, and Dr. May testified that he monitored her pulse and blood pressure on an LED screen on a machine. Dr. May’s staff disputed that the machine was used during the procedure. Additionally, there is no written record of Latisha’s blood pressure. After packing the extraction sites with gauze, Dr. May’s staff watched Latisha for ten to fifteen minutes prior to releasing her. Latisha informed them that she was feeling “very weak,” and she was given ammonia. The notation in Latisha’s medical record indicated that the ammonia helped and that Latisha was placed into Barrow’s car at approximately 3:00 p.m. to be driven home. Barrow was provided with Dr. May’s contact information and was instructed to call if there were any questions.
¶ 6. En route to their home in Sunflower County, Barrow called Dr. May’s office *1033 and spoke to Angie Fortenberry, Dr. May’s practice manager. Barrow told Fortenberry that Latisha was very weak and mumbling; Barrow further inquired as to when Latisha’s medication was going to wear off. Fortenberry told Barrow to continue monitoring Latisha because the medication wears off differently for different people but that mumbling was not unusual since Latisha’s gums had been deadened and her mouth was full of gauze. Fortenberry instructed Barrow to call back if she had any other questions or concerns. Barrow did not contact Dr. May’s office again.
¶ 7. Latisha arrived home and was taken to bed to rest. At some point that night, Latisha sat up and leaned over pillows trying to catch her breath. Her father called an ambulance, and at about 9:00 p.m., Latisha was taken to the emergency room in Indianola, Mississippi. She was in full code, and the hospital was unable to revive her. Latisha was pronounced dead at approximately 10:04 p.m. The autopsy report listed Latisha’s cause of death as a massive cardiomegaly. The autopsy report further showed that both Latisha’s lungs were filled with serosanguinous fluid and that her liver was enlarged.
¶ 8. Barrow filed suit against UMMC, Dr. Moore, and Dr. May on December 8, 2007. Claims against UMMC and Dr. Moore are not at issue in this appeal since both UMMC and Dr. Moore entered into a settlement with Barrow a few days before trial. In addition to other witnesses, Barrow designated Dr. Orrett Ogle as an expert witness in oral surgery and Dr. Robert Stark as an expert witness in cardiology and on the issue of causation. Dr. Stark was Barrow’s sole expert witness on causation because Dr. Ogle declined to offer any testimony as to causation. After Barrow designated Dr. Stark as an expert witness, Dr. May filed a motion to partially strike Dr. Stark’s affidavit and report because Dr. Stark lacked knowledge and training in the fields of dentistry and oral surgery. The circuit court granted Dr. May’s motion. Several days before trial, Dr. May filed a Daubert motion to exclude Dr. Stark’s testimony on the issue of causation. Trial commenced on Monday, July 19, 2010. After the jury pool was qualified, the circuit court held a Daubert hearing, and the Daubert motion was taken under advisement. On July 20, 2010, the circuit judge advised both parties that he was inclined to grant the Daubert motion, but he wanted the trial to proceed since Dr. Stark was en route to Jackson, Mississippi, and he could consider Dr. Stark’s live testimony. The circuit judge further advised the parties that the Daubert ruling would be withheld until after Dr. Stark provided his testimony. The following day, Dr. Stark testified that Latisha died due to an acceleration of her CHF to acute heart failure due to the stress of the oral surgery. Citing to a portion of Dr. Arthur Guyton’s Textbook of Medical Physiology entitled “Acute Pulmonary Edema in Late Stage Heart Failure — A Lethal Vicious Circle,” Dr. Stark testified that the stress caused a surge of adre-nergic activity sending Latisha into a “lethal vicious circle” resulting in her death. Dr. Stark testified that the lethal vicious circle is “usually set off by some temporary overload of the heart, such as might result from a bout of heavy exercise, some emotional experience, or even a severe cold.” Dr. Stark stated that the fear of the dental surgery or the surgery itself produced a surge of adrenaline in Latisha that set off the “lethal vicious circle.” The record reflects that Barrow’s and Dr. May’s attorneys, as well as the circuit judge, acknowledged that Barrow had no expert witness on causation other than Dr. Stark. The circuit court granted Dr. May’s Daubert motion and ultimately *1034 granted a directed verdict in favor of Dr. May finding that Dr. Stark’s testimony was too speculative and that Barrow had failed to establish causation. Barrow filed a motion for a new trial, but that motion was denied on September 22, 2010.
¶ 9. On appeal, Barrow raises the following issues:
I. Whether the [circuit] court abused its discretion and committed reversible error when it found that the opinions of [Barrow’s] causation expert were mere speculation, where said expert was found to be a qualified and board-certified expert in cardiology and internal medicine, and whose opinions were supported by the evidence and medical literature, and unopposed by any medical testimony, much less by any medical expert testimony in conjunction with any opposing medical literature.
II. Whether the [circuit] court abused its discretion by (1) hearing a Dau-bert motion filed on the eve of trial, where said motion was proffered as being a dispositive motion, if granted, despite the distant passing of the dispositive motion deadline in the pretrial order; (2) refusing to allow the inclusion of additional medical literature by [Barrow’s] expert in response to the late-filed Daubert motion; and (3) refusing to allow expert testimony based adherence to artificial titles or distinctions rather than on the expert’s demonstrated knowledge or expertise.
STANDARD OF REVIEW
¶ 10. “The standard of review for the admission or exclusion of evidence, such as expert testimony, is an abuse of discretion.” Denham v. Holmes, 60 So.3d 773, 783 (¶ 34) (Miss.2011) (quoting Investor Res. Servs. v. Cato, 15 So.3d 412, 416 (¶ 2) (Miss.2009)). An appellate court will not overturn the decision of the trial court on an evidentiary issue unless the trial court abused its discretion, meaning that the decision was arbitrary or clearly erroneous. Worthy v. McNair, 37 So.3d 609, 614 (¶ 13) (Miss.2010).
DISCUSSION
¶ 11. In a medical-malpractice suit, “a plaintiff must show: (1) the existence of a duty on the part of the physician to conform to a specific standard of conduct; (2) the specific standard of conduct; (3) that the physician’s breach of the duty was the proximate cause of the plaintiffs injury, and (4) that damages resulted.” Young v. Univ. of Miss. Med. Ctr., 914 So.2d 1272, 1276 (¶ 15) (Miss.Ct.App.2005) (citing Barner v. Gorman, 605 So.2d 805, 808-09 (Miss.1992)). In order to satisfy the proximate-cause element, “[t]he plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough.” Burnham v. Tabb, 508 So.2d 1072, 1074 (Miss.1987) (citations omitted). Expert testimony is required to establish the first three elements, and without expert testimony supporting each element, a defendant is entitled to summary judgment. Hubbard v. Wansley, 954 So.2d 951, 956-7 (¶ 12) (Miss.2007). The expert’s testimony must “identify and articulate the requisite standard that was not complied with, [and] the expert must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries.” Id. at 957 (¶ 12) (quoting Barner v. Gorman, 605 So.2d 805, 809 (Miss.1992)).
I. Dr. Stark’s Testimony
¶ 12. Barrow first asserts that the circuit court abused its discretion by deter *1035 mining Dr. Stark’s testimony as to causation was too speculative and granting Dr. May’s Daubert motion. According to Barrow, Dr. Stark was folly qualified as an expert witness, and his testimony and opinions were supported by sound medical literature.
¶ 18. We find Barrow’s argument unpersuasive. First, Barrow cites to Hill v. Mills, 26 So.3d 322, 332-33 (¶ 41) (Miss.2010), for the proposition that “when the reliability of an expert’s opinion is attacked with credible evidence that the opinion is not accepted within the scientific community, the proponent of the opinion under the attack should provided at least a minimal defense supporting the reliability of the opinion.” Our review of the record does not indicate that Dr. May or the circuit court attacked Dr. Stark’s testimony on the ground that it was not accepted within the scientific community. Rather, it appears that the circuit court was concerned with Dr. Stark’s application of the relevant medical literature to the facts of the current case. The essence of Dr. Stark’s testimony at trial was that the stress of the anticipation of the surgery and the surgery itself produced a surge of adrenaline in Latisha’s body and that according to the accepted medical literature, this surge of adrenaline sent Latisha into a “lethal vicious circle” that ultimately led to her death. According to Dr. Stark, the lethal vicious circle occurs
when you have a trigger[,] like this surgery or a huge release of adrenaline!;] you can get an increase in the heart rate and a temporary increase in heart con-tractility that can cause a vicious cycle when the heart tries to pump harder, tries to perform better, but it [cannot] because the person has congestive heart failure. And that can increase the heart’s need for oxygen. The heart uses more oxygen, but because the heart is diseased, it cannot utilize that oxygen to pump better. And that is a vicious cycle that leads to more oxygen deficit in the heart muscle, decrease[d] pump function of the heart, [and] more pulmonary edema. The person [cannot] breath and— and they die.
When asked about his opinion as to what caused Latisha’s cardiac death, Dr. Stark stated: “She had a cardiac death due to cardiac failure and/or cardiac arrhythmia.” Dr. Stark testified that sixty to seventy percent of CHF patients reaching the end of the lethal vicious circle die of arrhythmia and forty percent die of pump failure. Therefore, according to Dr. Stark, the stress of the surgery, the surgery itself, and the resulting surge of adrenaline resulted in either acute cardiac failure or an arrhythmia. However, on cross-examination, Dr. May asked the following question: “And you have no idea as we sit here today whether [Latisha] had a fatal arrhythmia or just a pump failure.” Dr. Stark’s response: “That’s-that’s correct.”
¶ 14. In regard to the admissibility of expert witness testimony, “the trial judge is to act as a gatekeeper, ensuring that expert testimony is both relevant and reliable.” Poole v. Avara, 908 So.2d 716, 723 (¶ 15) (Miss.2005) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). Under Daubert, a two-prong inquiry is provided for a trial judge to determine if an expert witness’s testimony is admissible: “(1) whether the expert opinion is relevant in that it must ‘assist the trier of fact’ and (2) whether the proffered opinion is reliable.” Rhodes v. Rhodes, 52 So.3d 430, 445 (¶ 63) (Miss.Ct.App.2011) (citing Miss. Tramp. Comm’n v. McLemore, 863 So.2d 31, 38 (¶ 16) (Miss.2003)). Mississippi Rule of Evidence 702 also provides guidance when determining the admissibility of expert testimony. Rule 702 states:
*1036 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
When granting Dr. May’s motion for directed verdict, the circuit judge stated that Dr. Stark was the sole witness on the issue of causation and that he found Dr. Stark’s opinions “relating to causation in large part were based on speculation about what occurred on July 14, 2006, regarding Latisha Barrow.” In his written opinion, the circuit judge reiterated that Dr. Stark’s opinions on the causation issue were based largely on speculation. It is undisputed that Latisha was a high-risk patient due to her late-stage CHF. According to Dr. Stark’s testimony, it was the anticipation of the oral surgery and the surgery that sent Latisha into the lethal vicious circle that resulted in either an arrhythmia or pump failure; however, Dr. Stark was not aware of any of Latisha’s other activities or stressors that occurred that day. Dr. Stark was specifically unaware that Latisha had met with a recent heart-transplant recipient before her oral surgery to discuss all aspects of the transplantation process. Latisha also discussed the implantation of an ICD and the seriousness of her condition with her cardiac electrophysiologist that same day. As the circuit judge stated, Dr. Stark’s testimony did not fully consider all the stressors on Latisha that day.
¶ 15. Additionally, Latisha signed a document consenting to the procedure.[2] The document stated that the administration of any anesthesia or sedation involves certain risks, including: “An allergic or unexpected reaction. If severe, allergic reactions might cause more serious respiratory (lung) or cardiovascular (heart) problems which may require treatment.” The document further stated that there could be “[cjardiovascular or respiratory responses which may lead to heart attack, stroke, or death.” Latisha signed the document on June 22, 2006, and acknowledged that she had “read and [understood] the above and [gave her] consent to surgery.” As Dr. May’s attorney stated, “even the stress of anticipation of the surgery could have caused this vicious circle to begin. Whether the surgery was done properly [or] improperly[, the lethal vicious circle] could have occurred because she was thinking about it, anticipating it, [and] going to the doctor’s office to have the surgery done.” Under Dr. Stark’s explanation, even if Dr. May decided at the last minute not to proceed with the surgery that day, Latisha could still have experienced the lethal vicious circle due to her anticipation of the surgery. We find no case law and have had none provided to us by Barrow to support the proposition that a doctor may be held liable for the death of his patient caused by stressors necessarily incident to the oral surgery itself, such as the anticipation of surgery or the necessary pain incidental to surgery. Moreover, Latisha, an adult at the time, had given her informed consent to undergo the surgery and suffer such necessarily incidental risks.
¶ 16. The dissent proposes to reverse and remand this case pursuant to Mississippi Rule of Civil Procedure 52 because the record is inadequate for this Court to *1037 review due the circuit court’s failure to provide findings of fact and conclusions of law. Rule 52 provides that “[i]n all actions tried upon the facts vnthout a jury the court may, and shall upon the request of any party to the suit or when required by these rules, find the facts specially and state separately its conclusions of law thereon and judgment shall be entered accordingly.” (Emphasis added). First, it should be noted that neither party requested the circuit court provide findings of facts and conclusions of law nor was this issue specifically raised by either party on appeal. The dissent raises it sua sponte. Additionally, this case clearly had a jury empaneled which distinguishes it from the language found in Rule 52. Simply, this is not a Rule 52 issue.
¶ 17. Based on Dr. Stark’s testimony at trial regarding the cause of Latisha Barrow’s death and very thorough arguments by Barrow’s and Dr. May’s counselors, the circuit judge concluded that Dr. Stark’s testimony did not satisfy Daubert and/or Rule 702 and that his testimony would not “assist the trier of fact” and was not reliable on causation. The circuit judge, therefore, excluded Dr. Stark’s opinion on causation. To summarize in this case, we are confronted with a high-risk patient for sudden death due to arrhythmia who underwent a disturbing, if not traumatic, discussion with her cardiac electrophysiologist about the need to have an ICD implanted and a discussion with a heart-transplant recipient just hours before the oral surgery. Additionally, Latisha consented to the oral surgery and those necessary risks inherent in the procedure. Dr. Stark’s testimony failed to take these other factors into consideration when providing his testimony. Ultimately, we cannot conclude that the circuit court abused its discretion in finding Dr. Stark’s testimony was too speculative to assist the jury in determining causation.
II. Other Alleged Abuses of Discretion
¶ 18. Barrow next asserts that the circuit court abused its discretion in the following ways:
1. [by] hearing a Daubert [m]otion filed on the eve of trial, where said motion was proffered as being a dispositive motion, if granted, despite the distant passing of the dispositive motion deadline in the pretrial order[;]
2. [by] refusing to allow the inclusion of additional medical literature by [Barrow’s] expert in response to the late-filed Daubert [m]otion[; and]
(3) [by] refusing to allow expert testimony based adherence to artificial titles or distinctions rather than on the expert’s demonstrated knowledge or expertise.
¶ 19. In regard to Barrow’s first sub-issue concerning the timeliness of Dr. May’s Daubert motion, one citation, to Hyundai Motor Am. v. Applewhite, 53 So.3d 749 (Miss.2011), is provided. In that case, Hyundai Motor America did not file a Daubert motion until after trial. Id. at 754 (¶ 15). The Mississippi Supreme Court stated: “Although a pretrial motion and hearing challenging the admissibility of expert opinions may in some, if not most, cases be a prudent practice, this Court has held that this is not the exclusive means of mounting challenges to such testimony.” Id. at (¶ 16). It further stated: “While the trial judge has discretion with regard to when and how to decide whether an expert’s testimony is sufficiently reliable to be heard by a jury, this does not eliminate the requirement that the party opposing the evidence make a timely objection to its being admitted into evidence.” Id. at 755 (¶ 17). Hyundai is distinguishable from the current case because in this case, the Daubert motion was filed prior to trial, *1038 whereas in Hyundai the Daubert issue was not raised until after trial. As the supreme court stated, while it is the “prudent practice” to bring a Daubert motion prior to trial, that “is not the exclusive means of mounting challenges to such [expert] testimony.” Hyundai Motor America, 58 So.3d at 754 (¶ 16). Therefore, we find that the circuit judge did not abuse his discretion in allowing Dr. May’s Dau-bert motion so close to trial.
¶ 20. Next, Barrow argues that the circuit judge erred in not allowing into evidence additional medical literature to support Dr. Stark’s testimony after the trial began. Barrow cites no relevant authority to support this contention; therefore we will not address this issue. See Mann v. Mann, 904 So.2d 1188, 1185 (¶ 12) (Miss.Ct.App.2004).
¶ 21. Lastly, Barrow argues that the circuit judge erred in sustaining Dr. May’s objection to Dr. Stark’s testimony based on an objection to “artificial medical titles” even though Dr. Stark was fully qualified to testify as to the issues. Specifically, Barrow challenges the circuit judge’s decision to prohibit Dr. Stark “from testifying about the treatment administered to [CHF] patients in a hospital setting.” Barrow was seeking Dr. Stark’s opinion as to the care an oral surgery patient with CHF would receive in a hospital setting. As Dr. Stark was a cardiologist and not an oral surgeon or anesthesiologist, expressing such an opinion was outside of his knowledge and training. Based on our review of the record, we cannot conclude the circuit judge abused his discretion.
¶ 22. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ„ CONCUR. RUSSELL, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J.

. See Daubert v. Merrell Dow Pharms., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. The issue of lack of informed consent was not raised at trial or on appeal.