# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00377-COA

**DAPHANE FONVILLE, AS PARENT AND NATURAL GUARDIAN OF DEREK FONVILLE, A MINOR**                    APPELLANT

**v.**

**LOUAY ZEID, M.D. AND USHA J. MEHTA, M.D., P.A., A MISSISSIPPI CORPORATION**                    APPELLEES

DATE OF JUDGMENT:                12/19/2019
TRIAL JUDGE:                    HON. CELESTE EMBREY WILSON
COURT FROM WHICH APPEALED:      DESOTO COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:        GARRY JAMES RHODEN
                                JONATHAN T. GILBERT
                                RONALD S. GILBERT
                                CHRISTOPHER WAYNE WINTER
ATTORNEYS FOR APPELLEES:        CLINTON M. GUENTHER
                                TOMMIE G. WILLIAMS
NATURE OF THE CASE:             CIVIL - MEDICAL MALPRACTICE
DISPOSITION:                    AFFIRMED - 09/14/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., GREENLEE AND LAWRENCE, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1.    Daphane Fonville, on behalf of her son Derek Fonville, sued Dr. Louay Zeid and Dr. Usha Mehta (the Defendants) for alleged negligence during Derek's delivery. The jury returned a verdict for the Defendants. Daphane filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial. The circuit court denied Daphane's motion. Daphane appealed, raising several issues: (1) whether the trial court's decision allowing the Defendants' experts to render opinions regarding substantive matters not sufficiently

disclosed through discovery constituted "trial by ambush"; (2) whether the trial court erred in allowing defense expert witnesses to opine on possible causes within a reasonable degree of probability, including maternal forces of labor; and (3) whether the trial court erred by permitting the Defendants to introduce into evidence administrative discipline information pertaining to Daphane's obstetrical expert witness. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On the evening of October 30, 2014, Daphane was admitted to Baptist Memorial Hospital in Southaven, Mississippi, for labor induction after being diagnosed with severe preeclampsia.[1] Dr. Zeid, Daphane's obstetrician-gynecologist, attended to her labor and delivery. Daphane's labor progressed slowly; when it came time for her to push, she was too tired. At that point, Dr. Zeid informed her that he could either use the vacuum to facilitate delivery, or he could perform a caesarean section. Daphane opted to proceed with a vacuum delivery, and Dr. Zeid used a vacuum to advance labor. After Derek's head was delivered, Dr. Zeid noted Derek had shoulder dystocia.[2] Over the course of three minutes, Dr. Zeid tried to maneuver Derek out using the McRoberts maneuver,[3] suprapubic pressure, and

[1] Preeclampsia is "[d]evelopment of hypertension with proteinuria or edema, or both, due to pregnancy . . . ." *Preeclampsia*, Stedman's Medical Dictionary (28th ed. 2005), Westlaw Stedman's 717640.

[2] Shoulder dystocia is the "arrest of normal labor after delivery of the head by impaction of the anterior shoulder against the symphysis pubis." *Shoulder Dystocia*, Stedman's Medical Dictionary (28th ed. 2005), Westlaw Stedman's 274740.

[3] The McRoberts Maneuver is a "maneuver to reduce a fetal shoulder dystocia by flexion of the maternal hips." *The McRoberts Maneuver*, Stedman's Medical Dictionary

delivery of the posterior arm, in an attempt to relieve the shoulder dystocia. After the last maneuver, Dr. Zeid was able to deliver Derek. Derek had a limp arm as well as bruising on his neck and shoulder. He was later diagnosed with a brachial plexus injury, which causes weakness or paralysis in parts of the arm. Unfortunately, Derek's brachial plexus injury is permanent, and he will suffer that condition for the remainder of his life.

¶3.     On October 7, 2016, Daphane filed a complaint against the Defendants, alleging that Derek suffered injury and damages as a result of Dr. Zeid's failure to comply with the applicable standard of care during Daphane's labor and delivery. The Defendants subsequently filed an answer and affirmative defenses denying any negligence on Dr. Zeid's behalf. After a lengthy discovery process, the parties ultimately entered into an agreed scheduling order that required discovery to be completed by September 9, 2019.

¶4.     On October 3, 2019, the Defendants supplemented the expert opinions of Dr. Martin Tucker and Dr. Kyle Ball, whose depositions had originally been taken in 2018. In their supplemented opinions, both doctors referred to a 2014 monograph[4] from the American College of Obstetricians and Gynecologists (ACOG) on neonatal brachial plexus palsy. The doctors relied on that monograph as well as other medical literature to opine that maternal forces of labor were strong enough to cause both transient and permanent brachial plexus injuries. On October 28, 2019, Daphane filed a motion to strike those supplemental opinions.

(28th ed. 2005), Westlaw Stedman's 526090.

[4] A monograph is a detailed written study of a single specialized subject or an aspect of it.

3

That same day, Daphane also filed a *Daubert*[5] motion to limit or exclude maternal forces of labor as a defense or, in the alternative, to prevent testimony, argument, or inference of maternal forces of labor as a defense. Following a *Daubert* hearing, the trial court denied Daphane's motion to strike the defense experts' supplemental opinions. Additionally, the court denied Daphane's motion to limit or exclude maternal forces of labor as a defense. The court did allow supplemental depositions to occur. As a result of those orders, Daphane deposed the Defendants' experts for a second time regarding their supplemental opinions. Those depositions occurred in November 2019.

¶5.    On December 2, 2019, one week before trial, Daphane filed a motion for a continuance. She alleged that the new opinions from the defense experts substantially changed the claims and defenses for trial and were not based on any new discovery or literature. The trial court ultimately denied Daphane's motion for a continuance but struck portions of the Defendants' experts' supplemental opinions. Specifically, the court prohibited Dr. Ball from testifying about "pounds of force or pressure associated with delivery." In addition, the court prohibited Dr. Tucker from testifying to a "reasonable degree of medical probability that endogenous forces are the cause of Derek[] Fonville's injury."

¶6.    The case proceeded to trial on December 9, 2019. The following witnesses testified in behalf of Daphane: Dr. Berto Lopez, an expert in obstetrics; Tamar Fleischer, a nurse

---

[5] *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993).

4

practitioner and life-care planner; Dr. Edith Gurewitsch-Allen (through video deposition), an expert in obstetrics and maternal-fetal medicine; Dr. Ralph Scott, an economist; and Daphane herself. The Defendants presented the following witnesses: Dr. Tucker, an expert in obstetrics and maternal-fetal medicine, and Dr. Ball, an expert in obstetrics. Additionally, Dr. Zeid testified in his own behalf. To avoid repetition, particular testimony from each witness will be discussed when relevant in the analysis.

¶7. At the end of trial, the jury returned a verdict in favor of the Defendants. Daphane's post-trial motions were denied, and she filed a notice of appeal. Daphane now raises numerous issues on appeal, which we address in turn below.

## ANALYSIS

### 1. Whether the trial court's decision allowing the Defendants' experts to render opinions regarding substantive matters not sufficiently disclosed through discovery constituted "trial by ambush."

¶8. Daphane claims that she was ambushed by Dr. Tucker's and Dr. Ball's supplemental opinions tendered on October 3, 2019, approximately two months before trial. She also claims she was ambushed by the Defendants' use of the 2014 ACOG monograph because the Defendants did not give her a copy of the entire monograph before trial.

### A. Defense Expert Testimony

¶9. Daphane first argues that the Defendants' failure to disclose Dr. Tucker's and Dr. Ball's expert supplemental opinions and documents before the discovery deadline resulted in a "trial by ambush." "The standard of review for the admission or exclusion of evidence,

such as expert testimony, is an abuse of discretion." *Barrow v. May*, 107 So. 3d 1029, 1034 (¶10) (Miss. Ct. App. 2012) (quoting *Denham v. Holmes*, 60 So. 3d 773, 783 (¶34) (Miss. 2011)). "An appellate court will not overturn the decision of the trial court on an evidentiary issue unless the trial court abused its discretion, meaning that the decision was arbitrary or clearly erroneous." *Id*. (citing *Worthy v. McNair*, 37 So. 3d 609, 614 (¶13) (Miss. 2010)).

¶10. The Defendants initially disclosed Dr. Ball's and Dr. Tucker's opinions on March 23, 2018. Daphane first deposed Dr. Ball on August 8, 2018, and then deposed Dr. Tucker on October 18, 2018. On November 8, 2018, the parties entered into an agreed scheduling order setting the final discovery deadline for September 9, 2019. However, on October 3, 2019, the Defendants filed supplemental expert disclosures for both Dr. Ball and Dr. Tucker. In that document, the Defendants supplemented both doctors' opinions and stated, for the first time,[6] the doctors would opine that maternal forces of labor could cause both a transient and permanent brachial plexus injury, and that was what caused the injury Derek suffered during birth.

¶11. As a result of the newly supplemented opinions, on October 28, 2019, Daphane filed a motion to strike Dr. Ball's and Dr. Tucker's supplemental expert opinions.[7] On November

---

[6] In the Defendants' initial designation of expert witnesses, both doctors indicated reliance on the ACOG monograph, which discusses maternal forces of labor as a potential cause of transient brachial plexus injuries.

[7] The motion to strike never actually specified which parts of the "supplemental opinions" were new and should be stricken. However, the trial court's order denying the motion for a continuance entered on December 2, 2019, and striking the expert testimony only mentions Dr. Ball's supplemental testimony as to "pounds of force or pressure

25, 2019, the trial court entered an order nunc pro tunc to November 5, 2019, denying

Daphane's motion to strike the defense's supplemental expert opinions, stating:

> With regard to the portion of the motion that seeks to prevent Defendants'
> experts, Dr. Kyle Ball and Dr. Martin Tucker, from testifying regarding
> opinions expressed in supplements to their opinion disclosures, being informed
> by counsel for the parties that supplemental depositions of Dr. Ball and Dr.
> Tucker have been scheduled and will be taken by Plaintiff's counsel before
> trial the Court finds that portion of the motion is not well taken and is hereby
> denied.

¶12.   Following the court's ruling, Daphane deposed Dr. Ball a second time on November

11, 2019, and Dr. Tucker a second time on November 14, 2019.  On December 2, 2019,

Daphane filed a motion for a continuance, essentially arguing that the new opinions affected

her trial strategy and were not based on any new discovery or literature.[8]  On December 6,

2019, the trial court entered an order nunc pro tunc to December 4, 2019, denying Daphane's

motion for a continuance.  However, the trial court also struck portions of the Defendants'

experts' supplemental opinions.  Specifically, the court prohibited Dr. Ball from testifying

about "pounds of force or pressure associated with delivery."  Further, the court prohibited

Dr. Tucker from testifying "that endogenous forces of labor" were the cause of Derek's

injury.  Additionally, the court struck all articles disclosed "on or after" October 3, 2019.

---

associated with delivery" and Dr. Tucker's testimony that "endogenous forces of labor are
the cause of Derek[][Fonville's] injury."

[8] After the supplemental depositions, the Plaintiff did not file another motion to strike
the supplemental expert opinions but instead filed a motion to continue.  The trial court
denied the motion to continue but, in that same written order, ordered the supplemental
opinions that it had previously denied excluding to be excluded.

7

¶13.    To be clear, Daphane does not appeal the court's denial of her motion for a continuance.[9]  Further, Daphane is not appealing the trial court's striking of the defense supplemental expert disclosures as part of its denying the motion to continue.  She argues on appeal that the trial court committed reversible error by allowing Dr. Tucker and Dr. Ball to testify as to those supplemental opinions the trial court previously struck.  In particular, Daphane complains that Dr. Tucker testified to opinions that were previously prohibited by the court.  For example, Daphane cites to Dr. Tucker's first deposition[10] where he stated the following:

> **Q:**    What was the mechanism of injury?
>
> **A:**    I don't know the answer to that.
>
> **Q:**    Do you know if his permanent injury was caused by endogenous forces?
>
> **A:**    I can't say that specifically.

¶14.    At trial, Daphane complains about the following testimony elicited by defense counsel:

> **DEFENSE COUNSEL:**  Can maternal forces of labor—do you have an opinion as to a reasonable degree of medical certainty as to whether maternal forces of labor can cause severe and permanent brachial plexus injuries?
>
> **PLAINTIFF'S COUNSEL:**  Objection.  Your Honor.  It directly violates

---

[9] During oral argument before this Court, counsel indicated he was appealing the trial court's denial of the motion for a continuance.  But the issues raised in counsel's brief do not list that denial as an issue on appeal.

[10] Daphane first deposed Dr. Tucker on October 18, 2018.

what we just were going through.[11]

**THE COURT:** All right. I've ruled that he can testify on potential causes. I'll overrule the objection. You may proceed.

**DEFENSE COUNSEL:** Dr. Tucker, do you have an opinion to a reasonable degree of medical certainty—and these questions all imply if you have an opinion to a reasonable degree of medical certainty. You understand that?

**DR. TUCKER:** Yes, sir, I do.

**DEFENSE COUNSEL:** I may not repeat that rather cumbersome phrase every time. **Can maternal forces of labor cause severe and permanent injuries in brachial plexus?**

**DR. TUCKER:** Yes, sir.

**DEFENSE COUNSEL:** Can maternal forces of labor together with properly applied physician traction also cause such injuries?

**DR. TUCKER:** Yes, sir.

**DEFENSE COUNSEL:** Does the existence of a permanent brachial plexus injury—a permanent severe brachial plexus injury following shoulder dystocia prove that the delivering physician caused the injury with the application of excessive or inappropriate force?

**DR. TUCKER:** No, sir.

(Emphasis added).

¶15. As for Dr. Ball, Daphane argues that his trial testimony was a "new opinion" not previously given and violated the pretrial order. However, she fails to specify which testimony she is referring to, and she made no objection during his trial testimony on that

---

[11] Daphane's attorney was referring to a long on-the-record discussion concerning his prior objection to Dr. Tucker testifying as to matters the court had previously prohibited.

ground. Even so, Daphane claims both experts' testimony resulted in "trial by ambush." First and foremost, it is hard to comprehend how Daphane can claim ambush when she was notified of the supplemental opinions on October 3, 2019, questioned Dr. Tucker and Dr. Ball about those opinions in supplemental depositions that occurred prior to trial, and had articles disclosed to her on March 23, 2018, detailing the authoritative framework for those supplemental opinions. Daphane cites no rule or caselaw that prohibits an expert from updating or modifying his opinion.[12] Second, as stated in the court's ruling, Daphane's attorney had already scheduled to depose both experts again and did so on November 11, 2019, and November 14, 2019, respectively. Thus, Daphane had the opportunity to question both experts on the new opinions and prepare for trial accordingly. Most importantly, the trial court ultimately struck the supplemental opinions. Therefore, the real question before this Court becomes: did the trial court commit reversible error as a result of specific questions asked by defense counsel at trial, objected to by plaintiff's counsel, and allowed to come before the jury?

¶16.  In reviewing the questions asked by defense counsel, it appears they were in compliance with the court's order and spoke of general causes. In ruling on the objection by

---

[12] Granted, the Defendants did violate the scheduling order by supplementing new expert opinions after the agreed-upon discovery deadline of September 9, 2019. However, the trial courts of this State are well equipped and perfectly capable of handling discovery issues, and this trial court did, in fact, handle the discovery issue in this case. The trial court's actions in handling the Defendants' discovery violation are not part of Daphane's appeal to this Court.

plaintiff's counsel, the court made clear that the earlier ruling still applied—that the defense expert was not allowed to opine that endogenous forces were **the** cause of Derek's injury. It was not until cross-examination, when Dr. Tucker was asked that exact question, that he gave his opinion in this case:

> **PLAINTIFF'S COUNSEL:** You have no opinion that endogenous forces, that's forces within, maternal forces of labor and such, the forces within the body, caused **this** brachial plexus injury, correct?
>
> **DR. TUCKER:** May I answer the question? . . . Yes. I do have an opinion that within a reasonable degree of medical probability the endogenous forces caused **this** injury.

(Emphasis added). Based on his initial response, it is clear Dr. Tucker was perplexed and concerned with answering the question asked by Plaintiff's counsel. He inquired whether he could answer the question, obviously attempting to comply with the pretrial order.

¶17. Further, in Dr. Gurewitsch-Allen's video testimony played for the jury, endogenous forces of labor was discussed, and she denied that those forces alone could cause the injury in Derek Fonville's case. So, this issue essentially becomes one where experts gave different opinions. Often times, in trial, this is commonly referred to as a "battle of the experts."[13] In such situations, the jury decides the ultimate issue when experts offer different opinions. In summary, the court handled the discovery violation. Both sides presented testimony as to

---

[13] In *Clark v. State*, 315 So. 3d 987, 997 (¶23) (Miss. 2021), Justice Chamberlain stated for the majority, "That one party's expert witness contradicts the testimony of the other party's expert witness should come as no surprise. We even have a name for it. We call it a 'battle of the experts.'" (Quoting *Hill v. Mills*, 26 So. 3d 322, 330 (¶28) (Miss. 2010)).

endogenous forces of labor. The Defendants asked questions in a general manner, and Daphane asked questions that were case specific. The jury ultimately decided the issue of the cause of Derek's injury.

¶18. On appeal Daphane does not object to the trial court's reconsidering the motion to strike and striking the supplemental opinions. Her counsel at oral argument indicated that if the evidence of maternal forces of labor was not presented, he "wouldn't be here."[14] However, Daphane's own expert testified about maternal forces of labor in her video deposition. Simply put, Daphane cannot argue she was prejudiced by testimony that she elicited herself and allowed, without objection or redaction, to be played in her expert's video deposition. *See, e.g.*, *Edwards v. State*, 441 So. 2d 84, 90 (Miss. 1983) (stating that "[i]t is an old principle that an attorney who invites error cannot complain of it"). Daphane was certainly aware of the proffered opinions and was allowed to, and did, depose both defense experts twice. Further, it was her attorney's questions that brought "endogenous forces of labor" testimony to the specific facts of this case rather than generally allowed as ordered by the court. That can hardly be classified as "trial by ambush." Accordingly, we affirm as to this issue.

### B. The 2014 ACOG Monograph

¶19. In addition, plaintiff's counsel claimed that he was ambushed by the 2014 ACOG monograph. At trial, plaintiff's counsel objected to the introduction of the monograph:

---

[14] In other words, he would not have appealed that issue.

> **PLAINTIFF'S COUNSEL:** Before that goes up on screen. Your honor, we would object. This is hearsay under Rule 803(18)(B). This was—the monograph itself **was never disclosed or provided to us in advance** . . . very specifically, your honor, 803(18)(B) indicates, quote, a treatise used in direct examination must be disclosed to an opposing party, and this was not. Therefore, it does not meet the exception. It's hearsay.

(Emphasis added). The court overruled the objection. As stated above, this Court reviews the admission or exclusion of evidence under an abuse-of-discretion standard. *See Barrow*, 107 So. 3d at 1034 (¶10) (quoting *Denham*, 60 So. 3d at 783 (¶34)).

¶20. In the Defendants' initial disclosure of expert witnesses on March 23, 2018, they disclosed their reliance on the 2014 monograph in accordance with Rule 803(18) as follows:

> In providing and discussing his opinions Dr. Tucker may refer to any or all of the following. [**These learned treatises are, thus, designated per MRE 803(18) for use at trial.**]
>
> 1. Shoulder Dystocia, ACOG Practice Bulletin No. 40, 2002.
> 2. Shoulder Dystocia, ACOG Practice Bulletin No. 178, 2017.
> 3. Shoulder Dystocia: The Unpreventable Emergency, Am. J. Ob Gyn (2006), 195.
> 4. Shoulder Dystocia: Is It Predictable, Eur J Ob Gyn Rep Biol 62 (1995).
> **5. Neonatal Brachial Plexus Palsy, ACOG (2014)** . . . .[15]

(Emphasis added) (first brackets in original).

¶21. Mississippi Rule of Evidence 803 provides exceptions to the hearsay rule. In particular, Rule 803(18)(B) provides that a statement contained in a treatise, periodical, or pamphlet is excepted from the rule against hearsay if

---

[15] The remaining articles listed are omitted since there is no dispute concerning those articles on appeal.

the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.

If admitted, the statement may be read into evidence but not received as an exhibit. A treatise used in direct examination **must be disclosed** to an opposing party without charge in discovery.

(Emphasis added).

¶22. On appeal, Daphane argues that it was reversible error for the trial court to allow the monograph into evidence because the Defendants were required to "produce" the monograph during discovery to satisfy the disclosure requirement under Mississippi Rule of Evidence 803(18).[16] However, Daphane's attorney admitted at oral argument that he had a copy of the monograph and was familiar with the information contained therein. In fact, Daphane's own expert witness, Dr. Gurewitsch-Allen is cited in the monograph at least three times and testified that she was familiar with at least five members of the monograph task force.

¶23. The ACOG monograph is not an elusive document. It is listed on the ACOG's website, easily downloadable, and easily traced with a simple internet search. However, those facts are not outcome determinative. What is outcome determinative is the language of the rule itself. Rule 803(18) clearly indicates "disclosed" instead of "produced," as alleged by Daphane. There is little doubt and in fact no dispute that the ACOG monograph was disclosed. It had been disclosed by the defense since March 23, 2018, along with

---

[16] At trial, Daphane's counsel claimed the ACOG monograph was neither disclosed nor produced. On appeal, her counsel now argues that it was not "produced" as purportedly required by Rule 803(18).

14

eighteen other documents listed as being "disclosed" pursuant to Rule 803(18). The language used in the disclosure even indicated it was being disclosed pursuant to the language of the rule Daphane now claims as error.

¶24.    At the *Daubert* hearing on November 7, 2019, plaintiff's counsel admitted to the court that he was aware of the monograph:

> **PLAINTIFF'S COUNSEL:** The defendants attempt to defend this case by suggesting this unproven theory, this hypothesis, is that the maternal forces of labor or endogenous forces can cause a Klumpke's palsy. The defendants and their experts have provided some literature to support that position, including some from a group called ACOG, the American Congress [sic] of Obstetrics and Gynecology.

Further, at trial during his cross-examination of Dr. Ball, plaintiff's counsel questioned Dr. Ball about the monograph and recognized that his own expert witness, Dr. Gurewitsch-Allen, was cited in the monograph numerous times.

¶25.    On appeal, the only argument Daphane makes as to Mississippi Rule of Evidence 803(18) is that the word "disclose" means "produce," and because the Defendants never produced the ACOG monograph in its entirety, reversible error occurred. The language in the Rule states that "[a] treatise used in direct examination **must be disclosed** to an opposing party without charge in discovery." MRE 803(18) (emphasis added). Daphane would ask: why would the rule address the costs of production if the use of the word "disclosed" only means to notify and not produce? First, it is important to note that Mississippi's Rule of Evidence 803(18)(B) is the only state to include the additional language concerning costs of production. No other state includes such language. The federal rules of evidence do not

15

include such language either.[17]  However, the "cost" language can easily be reconciled with the use of the word "disclosed" in answering the question posed by this issue.

¶26.    If a party discloses an intent to use an article or some literature pursuant to Rule 803(18), and the opposing party cannot locate it for preparation for trial, it follows that a motion to compel could be filed for the "disclosed" article or literature to then be produced. The rule's "cost" provision would then guide the court on which party would bear the cost of production.  In this case, no such motion to compel was ever filed in part most likely because the Plaintiff had a copy, as admitted by her attorney at oral argument.  Therefore, the cost provision of Rule 803(18) would not apply.  Since the defense clearly "disclosed" the ACOG monograph, compliance with the rule occurred, and no prejudice to the Plaintiff can be shown.  Thus, this issue is without merit.

**II.      Whether the trial court erred in allowing the defense's expert witnesses to opine on possible causes within a reasonable degree of probability, including maternal forces of labor.**

¶27.    Daphane's argument under this issue is three-fold.  First, she contends that the trial court erred in permitting Dr. Tucker to opine on possible causes of Derek's injury that were not within a reasonable degree of medical probability.  Second, she argues that the trial court allowed improper questioning of the Defendants' expert witnesses.  And finally, she claims that the trial court erred in allowing Dr. Tucker to testify about maternal forces of labor as

---

[17] Federal Rule of Evidence 803(18) does not contain the sentence, "A treatise used in direct examination must be disclosed to an opposing party without charge in discovery."

16

a potential cause of a brachial plexus injury.

### A.    Reasonable Degree of Medical Probability

¶28.    Daphane asserts that Defendants' experts testified to the incorrect legal standard by stating "possible" causes rather than the correct "probable" cause legal standard.  She further claims that this error allowed Dr. Tucker to "backdoor" his causation opinion regarding maternal forces of labor as the cause of Derek's injury.

¶29.    Before Dr. Tucker testified, Plaintiff's counsel objected to Dr. Tucker testifying to "medical probability on possible causes."  The court overruled his objection.  During his testimony, Dr. Tucker opined that within a reasonable degree of medical certainty, there were four potential causes of a brachial plexus injury (1) a positional injury from lying in utero; (2) maternal, or endogenous, forces of labor; (3) a congenital abnormality; and (4) delivery maneuvers, even if performed correctly.

¶30.    In *Martin v. St. Dominic-Jackson Memorial Hospital*, 90 So. 3d 43, 48-49 (¶15) (Miss. 2012), the Mississippi Supreme Court stated:

> Mississippi jurisprudence does not require medical testimony to contain any magical words, but medical testimony is not probative unless it speaks in terms of probabilities rather than possibilities.  "As this Court has frequently said, verdicts and judgments in civil actions must be based on the probabilities of the case, not on possibilities; and a verdict, although it is treated with great respect, has no force to convert a possibility into a probability."  However, "some speculation in medical matters is allowable and necessary."  "Perhaps nothing is absolutely certain in the field of medicine, but the intent of the law is that if a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can a jury use that information to reach a decision."

17

(Citations omitted).

¶31. Here, contrary to Daphane's assertion, Dr. Tucker did not provide mere possibilities. He instead provided four potential causes of a brachial plexus injury within a reasonable degree of medical certainty, which is allowed under Mississippi law. For example, in *Pittman v. Hodges*, 462 So. 2d 330, 333 (Miss. 1984), the defendant's expert witness provided three alternatives to the plaintiff's injury, all of which he opined were within a reasonable degree of medical certainty. On appeal, the supreme court found no error in the expert's testimony and reiterated that "absolute certainty is not required for an expert witness and whenever facts are in dispute, or the evidence is such that fairminded men may draw different inferences, a measure of speculation and conjecture is allowed." *Id*. at 334 (citing *Jesco Inc. v. Shannon*, 451 So. 2d 694, 700 (Miss. 1984)). Similarly in this case, Dr. Tucker opined on alternative causes for a brachial plexus injury, all within a reasonable degree of medical certainty, and the jury was allowed to draw inferences from those alternative causes and determine whether the Defendants were liable for medical malpractice.[18] In conclusion, the court did not apply an incorrect legal standard, and we find this argument is without merit.

### B.    Improper Questioning

---

[18] As previously stated, the trial court prohibited maternal forces of labor as a specific cause of Derek's injury. Dr. Tucker provided generalized testimony on maternal forces of labor on direct examination and redirect examination. However, when specifically asked by plaintiff's counsel's cross-examination, Dr. Tucker opined that maternal forces of labor was the actual cause of Derek's injury. *See supra* ¶16.

¶32.    Daphane argues that Defendants improperly posed numerous hypotheticals to both sides' witnesses and elicited testimony that was unfounded in scientific data.  For example, Daphane takes issue with a hypothetical defense that counsel asked Dr. Zeid on direct examination:

> **DEFENSE COUNSEL:**  All right.  So in a situation hypothetically—well, let me set it up this way.  If a patient a hypothetical patient similar to Ms. Fonville, was in the second stage of labor for two hours . . . or more but the baby was doing fine and there were no problems with the mother . . . would the standard of care require a [cesarean] section?
>
> **DR. ZEID:**  No.

Defense counsel also posed the following hypothetical to Dr. Ball on direct examination:

> **DEFENSE COUNSEL:**  If Dr. Zeid had known to the gram, let's say, at the time of the last prenatal visit . . . that this baby was going to weigh 4,426 grams, would the standard of care had required a [cesarean] section at the time?
>
> **DR. BALL:**  No, it would not.

On cross-examination, defense counsel asked Dr. Lopez, one of Daphane's expert witnesses, the following:

> **DEFENSE COUNSEL:**  You talked about indications for certain medications and procedures.  Does it mean the same to say that a medical procedure is indicated and that failure to perform that medical procedure at that time is a breach of the standard of care?
>
> **DR. LOPEZ:**  Well, that's a very broad hypothetical.
>
> **DEFENSE COUNSEL:**  Well, let me see if I can do better.  Does your use of the word that something is indicated, per se, meaning the failure to do whatever you're talking about is a breach of the standard of care?

19

**DR. LOPEZ:** It can be.

**DEFENSE COUNSEL:** Does it mean, per se, that if something is indicated and not done, that equates with a breach of the standard of care? Period. End of discussion.

**DR. LOPEZ:** Your hypothetical is very incomplete . . . . I'm unable to [answer to your question] because of the lack of specificity of the facts that the standard of care may or may not apply. I think we would all agree in the face of fetal distress, that cesarean section is indicated because you want to get the baby out before it has hypoxic injury. It's also reasonable that if the mother has not made progress, as was the case here initially, that Dr. Zeid's decision to reevaluate her after discussing doing a [cesarean] section in an hour and a half was a reasonable thing to do and not to perform a cesarean section because there was no fetal distress.

¶33. Daphane made no objections to any of these hypotheticals at trial. It is well settled that this Court will not consider arguments raised for the first time on appeal. *Bay Point Prop. Inc. v. Miss. Transp. Comm'n*, 201 So. 3d 1046, 1055 (¶18) (Miss. 2016) (citing *Anderson v. LaVere*, 136 So. 3d 404, 410 (Miss. 2014)). Consequently, we find this issue is procedurally barred.

¶34. Procedural bar notwithstanding, "[i]rregularity of hypothetical questions, and questions that are improperly formed without being misleading, are not ordinarily considered reversible errors." *Glens Falls Ins. Co. of Glens Falls, N.Y. v. Linwood Elevator*, 241 Miss. 400, 419, 130 So. 2d 262, 269 (1961). In reviewing the transcript, this Court cannot say that the Defendants' use of hypothetical questions, as complained of by Daphane, amounted to reversible error.

### C. *Daubert* Hearing on Maternal Forces of Labor

¶35. Daphane argues that the trial court failed in its gatekeeping role under *Daubert* by allowing the Defendants to use maternal forces of labor as a defense. She reasons that numerous state courts have rejected that theory as "junk science" and that the Defendants' experts had no data or scientific evidence to support their argument.

¶36. The admission of expert testimony is in the sole discretion of the trial court. *Union Carbide Corp. v. Nix Jr.*, 142 So. 3d 374, 388 (¶33) (Miss. 2014). When a party challenges an opposing party's opinion as not accepted within the scientific community, the party offering the testimony must present the trial judge with some evidence indicating that the opinion has some degree of acceptance and support. *Hill v. Mills*, 26 So. 3d 322, 331 (¶30) (Miss. 2010). A lack of consensus among sources does not render an expert's opinion inadmissible. *Patterson v. Tibbs*, 60 So. 3d 742, 751 (¶31) (Miss. 2011). "It is well-settled law that when conflicting expert testimony is presented, 'the winner in a battle of the experts is to be decided by a jury.'" *Hathaway v. Lewis*, 114 So. 3d 783 787 (¶14) (Miss. Ct. App. 2013) (quoting *Hill*, 26 So. 3d at 330 (¶28)).

¶37. As previously stated, the parties agreed to a discovery deadline of September 9, 2019. Daphane initially deposed both Dr. Ball and Dr. Tucker in 2018. On October 3, 2019, the Defendants filed supplemental expert disclosures for both Dr. Ball and Dr. Tucker. On October 28, 2019, Daphane filed two motions—a motion to strike the Defendants' supplemental expert disclosures and a motion to limit or exclude maternal forces of labor as a defense pursuant to *Daubert* or, alternatively, to prevent testimony on that issue. On

21

November 6, 2019, the Defendants filed a response in opposition to Daphane's motion to limit or exclude maternal forces of labor as a defense.

¶38. The court held a *Daubert* hearing on November 7, 2019. The Defendants introduced two exhibits at the hearing. The first exhibit was a copy of the members of the task force who produced the 2014 ACOG monograph. The second exhibit was a copy of professional organizations that endorsed the 2014 ACOG monograph. For the remainder of the hearing, each side presented arguments without any expert testimony. Following the hearing, the court denied both of Daphane's motions. Regarding the *Daubert* motion, the court found that Defendants had met their burden of proof under *Daubert* to present maternal forces of labor as a theory of defense. The court specifically ruled as follows: "[T]he Court, having considered the motion, Defendants' response in opposition thereto, and having heard arguments of counsel, finds that Defendants have met their burden of proof pursuant to *Daubert*, and, therefore, that the motion is not well taken, and the same hereby is DENIED." Daphane deposed Dr. Ball on November 11, 2019, and Dr. Tucker on November 14, 2019, and questioned them as to the supplemental opinions on maternal forces of labor.

¶39. Mississippi has adopted the *Daubert* standard for the admission of expert testimony, which consists of a "non-exhaustive, illustrative list of reliability factors" and focuses solely on "principles and methodology, not on the conclusions they generate." *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 35-36 (¶¶5, 13) (Miss. 2003) (citing *Daubert*, 509 U.S. at 579-95). "The objective of the trial court's gate-keeping responsibilities pursuant to

22

*Daubert* is to ensure the reliability and relevancy of expert testimony." *Hill*, 26 So. 3d at 330 (¶27) (citing *Kumho Tire Co. v. Patrick Carmichael*, 526 U.S. 137, 152 (1999)). Further, "[w]hile this Court might consider opposing testimonies in an evaluation of the weight or sufficiency of the evidence, we have no place comparing the two in determining the admissibility of one of their opinions." *Clark*, 315 So. 3d at 997 (¶23). As previously stated, that scenario is considered a "battle of the experts," in which the jury makes the ultimate decision. *Id*. (quoting *Hill*, 26 So. 3d at 330 (¶28).

¶40. At the outset, we note that there is no case in Mississippi preventing maternal forces of labor from being used as a theory of defense in a medical-malpractice claim. In an attempt to exclude maternal forces of labor as a defense, Daphane claimed several courts have held testimony regarding maternal forces of labor inadmissible. Daphane attached several examples to her *Daubert* motion, including a decision from an appellate court in Rhode Island, one appellate court ruling from New York, and three separate unpublished trial court rulings from Colorado, the District of Colombia, and Pennsylvania. It is worth noting that all five of those decisions predate the 2014 ACOG monograph. In addition, the Colorado trial court ruling cited by Daphane was later reversed by the Colorado Supreme Court. *See Ford v. Eicher*, 250 P. 3d 262 (Colo. 2011). Relatedly, a number of other states have held this type of testimony admissible. *See, e.g.*, *Taber v. Roush*, 316 S.W.3d 139, 153 (Tex. App. 2010); *Bayer ex rel. Petrucelli v. Dobbins*, 885 N.W.2d 173, 180-83 (Wis. App. 2016); *L.M. By & Through Dussault v. Hamilton*, 402 P.3d 870, 876-79 (Wash. App. 2017), *aff'd*, 436

23

P.3d 803 (Wash. 2019).

¶41. Daphane additionally argues that the Defendants failed to provide evidence to support maternal forces of labor as a theory of defense. However, the Defendants provided numerous articles and expert testimony to support their experts' theory. For example, the Defendants presented the 2014 ACOG monograph in support of their position that maternal forces of labor alone can cause neonatal brachial plexus palsy injuries.[19] The monograph's executive summary states "What is known at this time with reasonable medical certainty is that [n]eonatal brachial plexus palsy occurs infrequently and can be caused by maternal endogenous forces or clinician-applied (exogenous) forces or a combination of both." This monograph is endorsed by ten different organizations,[20] including the American Academy of Pediatrics, and was sanctioned and created at the direction of the ACOG. Dr. Tucker testified that maternal (or endogenous) forces of labor are a potential cause of a neonatal brachial plexus palsy injury. And as previously discussed, when asked on cross-examination,

---

[19] In 2011, the ACOG president-elect called for the formation of a task force on neonatal brachial plexus palsy. The group consisted of nine subject-matter experts. The task-force members were directed to answer, among other things, the following questions: (1) what is the incidence of neonatal brachial plexus palsy?; and (2) what are the endogenous and exogenous forces inherent in the process of labor and delivery that may cause or contribute to the development of neonatal brachial plexus palsy?

[20] These organizations follow: (1) The American Academy of Pediatrics; (2) The American Academy of Physical Medicine and Rehabilitation; (3) The American College of Nurse-Midwives; (4) The American Gynecological and Obstetrical Society; (5) The American Society for Reproductive Medicine; (6) The Child Neurology Society; (7) The Japan Society of Obstetrics and Gynecology; (8) The Royal Australian and New Zealand College of Obstetricians and Gynecologists; (9) The Society for Maternal-Fetal Medicine; and (10) The Society of Obstetricians and Gynecologists of Canada.

he opined that maternal forces of labor were the cause of Derek Fonville's neonatal brachial plexus palsy injury. On cross-examination, Dr. Ball likewise testified that maternal forces of labor were the cause of Derek's Fonville's neonatal brachial plexus palsy injury. In doing so, he relied on medical literature, including the 2014 ACOG monograph. Dr. Gurewitsch-Allen, Daphane's expert, agreed with the statement in the 2014 ACOG monograph that "maternal forces alone are an accepted cause of at least a transient [neonatal brachial plexus palsy] by most investigators." However, she disagreed with both defense experts that maternal forces of labor alone could cause a permanent brachial plexus injury, and, as a result, she disagreed that maternal forces of labor were the cause of injury in this case. She further opined that a permanent neonatal brachial plexus palsy injury could only result from "externally-applied force by the physician." As previously stated, Dr. Gurewitsch-Allen is cited numerous times as a reference in the 2014 ACOG monograph. She also admitted that she testified under oath on a previous occasion that the monograph was "authoritative." Additionally, she testified that she personally knew at least five of the task force members for the monograph, including the chair of the task force.

¶42. Simply put, the Defendants' experts opined that maternal forces of labor could cause a transient or permanent neonatal brachial plexus palsy injury, and Daphane's expert opined that maternal forces of labor alone could not cause a permanent neonatal brachial plexus palsy injury. Each side presented its own medical literature and caselaw to support its position. The Defendants' experts' testimony was relevant and supported by medical

25

literature, including the 2014 ACOG monograph, which Daphane's expert admitted was authoritative. For the aforementioned reasons, we find no error in the trial court's decision overruling the *Daubert* objection concerning maternal forces of labor.

> ### III. Whether the trial court erred by permitting the Defendants to introduce into evidence administrative discipline information pertaining to Daphane's obstetrical expert witness.

¶43. Finally, Daphane argues that the trial court erred in allowing the Defendants to impeach Dr. Lopez with administrative discipline information. Daphane further argues that this information was never disclosed to her during discovery and was "sprung" on Dr. Lopez during cross-examination.

¶44. This Court reviews the admission or exclusion of evidence under an abuse-of-discretion standard. *Williams v. State*, 54 So. 3d 212, 213 (¶5) (Miss. 2011). "For a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Hammons v. State*, 918 So. 2d 62, 65 (¶10) (Miss. 2005) (quoting *Holladay v. Holladay*, 776 So. 2d 662, 672 (¶40) (Miss. 2000)). And "[e]rror is reversible only where it is of such magnitude as to leave no doubt that the appellant was unduly prejudiced." *Id.* (internal quotation mark omitted) (quoting *Holladay*, 776 So. 2d at 672).

¶45. At trial, Dr. Lopez was admitted as an expert in obstetrics. During direct examination, he testified about his participation in five separate committees at several hospitals over the course of his career. As an elected member of those committees, Dr. Lopez was responsible

for supervising other doctors to ensure they provided quality care to patients. For instance, he described his 2006 executive committee at Columbia Hospital as the "highest political committee . . . that supervise[d] all aspects of doctor care in a hospital." He further explained that the committee "ha[d] a series of rules and regulations that govern[ed] the conduct of the doctors that work in the hospital." For several years, Dr. Lopez served as the vice chief of staff at Columbia Hospital, which was "the second most powerful position in the medical staff hierarchy." In that role, he "[made] sure that the doctors [were] behaving correctly." Dr. Lopez also served on an obstetrician-gynecologist evaluation committee for St. Mary's Hospital, which he described as a supervisory role:

> If you're a child, your mother checks your homework and then the teacher looks at it. When you're a doctor, a committee of doctors looks at your work. And if you're doing good, they leave you alone; and if you're doing things that aren't quite right, then they take some actions. And if you don't straighten up, you get referred to the medical executive committee, which is like the principal. So you have the principal, the teacher, and the student. So the doctors are continuously evaluated for the work that they do to make sure that they are doing things that they're supposed to be doing.

¶46. During direct examination, Dr. Lopez opined that Dr. Zeid violated the appropriate standard of care "by failing to perform a cesarean section on the two occasions that he himself talked to her about performing a cesarean section." On cross-examination, defense counsel asked Dr. Lopez whether he had been reprimanded and censored by the Florida Medical Board of Licensure on three separate occasions. Plaintiff's counsel immediately objected, and the court excused the jury and held a bench conference. The trial court ultimately found that the sanctions were relevant and probative to Dr. Lopez's expertise.

27

Thus, the court held that the sanctions could be used for impeachment but instructed the defense not to discuss the facts surrounding each sanction. At that point, plaintiff's counsel moved for a mistrial, arguing that the Defendants were required to provide this information during discovery and did not do so. Defense counsel responded that he was not required to share documents with plaintiff's counsel that he intended to use on cross-examination for impeachment. The trial court denied the motion for a mistrial, and defense counsel proceeded to question Dr. Lopez about several different administrative complaints filed against him. Defense counsel requested to mark the complaints and related documents for identification only, and plaintiff's counsel objected. The court overruled the objection, and the documents were mark for identification only as Exhibit 23. The documents were never shown to the jury.

¶47. On appeal, Daphane fails to provide any rule or caselaw to support her proposition that impeachment evidence must be disclosed or produced during discovery. There are, however, clear rules on the admission of evidence of witness credibility and potential bias. For example, Mississippi Rule of Evidence 611(b) states, "The court may not limit cross-examination to the subject matter of the direct examination and matters affecting the witness's credibility." Additionally, Mississippi Rule of Evidence 616 states that "[e]vidence of a witness's bias, prejudice, or interest—for or against any party—is admissible to attack the witness's credibility." Further, the Mississippi Supreme Court has stated that "[b]ias, prejudice and credibility are always in issue . . . [and that] [w]ide latitude is permitted in

28

cross-examination to show bias or motive and the [e]ffect on a witness's credibility." *Bennett v. State*, 933 So. 2d 930, 947 (¶58) (Miss. 2006); *see also Isaacks v. State*, 337 So. 2d 928, 929 (Miss. 1976).

¶48. In *Bennett*, the defendant was convicted of capital murder and sentenced to death. *Bennett*, 933 So. 2d at 930. At trial, the State elicited testimony that the defendant's expert had resigned after the County Coroners of Mississippi petitioned the governor and requested that she resign. *Id*. at 947. The expert denied the allegation. On appeal, Bennett argued that the trial court erred in allowing the State to ask his expert why she left the coroner's office in Mississippi. *Id*. at 946-47. More specifically, he claimed that his expert's reasons for leaving in no way affected her credibility or qualifications and were "completely unrelated" to the case. *Id*. The Mississippi Supreme Court ultimately held that the State's questions to defendant's expert were entirely proper to show the expert's personal feelings about the State's expert and her reasons for leaving her employment. *Id*.

¶49. Similar to the expert in *Bennett*, Dr. Lopez's impeachment attacked his credibility under Mississippi Rule of Evidence 611(b). Generally, Dr. Lopez was called to opine that Dr. Zeid deviated below the standard of care by (1) failing to perform an ultrasound during the delivery and hospitalization; (2) failing to document an estimated fetal weight prior to induction of labor; (3) failing to perform a cesarean section before the active phase of labor; and (4) failing to appropriately deliver Derek by applying more than gentle downward traction. At trial, the Defendants merely inquired into these prior disciplinary actions and the

29

alleged reasons for them and nothing more. The records of the prior disciplinary actions were not admitted into evidence, and the specifics of each case were not discussed. The Defendants' counsel solely used this prior disciplinary conduct to impeach Dr. Lopez on his credibility in relation to his supervisory committees at various hospitals.

¶50. Daphane additionally cites to Mississippi Rule of Evidence 609(b) in support of her argument that the trial court should have excluded this information. However, Rule 609(b) pertains to the use of prior **criminal** convictions to attack a witness's character for truthfulness and is therefore inapplicable here. The records being admitted are disciplinary actions, not criminal convictions, that are not being used for the purpose of attacking a witness's character for truthfulness. After review, we find no error in the trial court's decision to allow the Defendants to impeach Dr. Lopez with prior administrative disciplinary action.

**CONCLUSION**

¶51. In conclusion, there was no trial by ambush. Daphane was aware of the defense experts' supplemental opinions and had the opportunity to depose them for a second time. Daphane was aware of the 2014 ACOG monograph, and it was properly disclosed pursuant to Rule 803(18). Further, the trial court did not err in allowing defense expert witnesses to opine on possible causes within a reasonable degree of probability, including maternal forces of labor. And finally, the trial court did not err in allowing the Defendants to impeach Dr. Lopez with administrative discipline information. Accordingly, this Court affirms the circuit

30

court's order denying the post-trial motion and entry of judgment for the Defendants.

¶52.	**AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**